In the

# United States Court of Appeals
### For the Seventh Circuit

_____

No. 13-3853

UNIVERSITY OF NOTRE DAME,

*Plaintiff-Appellant*,

*v.*

KATHLEEN SEBELIUS, Secretary of U.S. Department of
Health & Human Services, *et al.*,

*Defendants-Appellees*,

*and*

JANE DOE 1, *et al.*,

*Intervening-Appellees*.

_____

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:13-cv-01276-PPS-CAN — **Philip P. Simon**, *Chief Judge*.

_____

ARGUED FEBRUARY 12, 2014 — DECIDED FEBRUARY 21, 2014

_____

Before POSNER, FLAUM, and HAMILTON, *Circuit Judges*.

POSNER, *Circuit Judge*. The Affordable Care Act requires
providers of health insurance (including companies that
administer self-insured employer health plans) to cover cer-

tain preventive services without cost to the insured, including, "with respect to women, such additional preventive care and screenings … as provided for in comprehensive guidelines supported by the Health Resources and Services Administration." 42 U.S.C. § 300gg-13(a)(4); see also 45 C.F.R. § 147.130(a)(iv), 76 Fed. Reg. 46621, 46623 (Aug. 3, 2011). Guidelines specifying such preventive care have now been promulgated, and they include "all Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity." Health Resources & Services Administration, "Women's Preventive Services Guidelines," www.hrsa.gov/womensguidelines (visited Feb. 21, 2014, as were the other websites cited in this opinion). To simplify exposition, we'll refer to all methods of female prevention of pregnancy as "contraceptives." (Male contraceptives are not covered by the guideline.)

The health concerns that motivated the inclusion of contraception in the guidelines on needs of women for preventive care begin with the fact that about half of all pregnancies in the United States are unintended, and 40 percent of them end in abortion and many others in premature births or other birth problems. Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps* 102–03 (2011), www.nap.edu/catalog.php?record_id=13181; Lawrence B. Finer & Mia R. Zolna, "Shifts in Intended and Unintended Pregnancies in the United States, 2001–2008," 104 *Am. J. Pub. Health* S43, S44 (2014). Many of the unintended pregnancies are teen pregnancies; contraceptive use has been found to be positively correlated with decreased teen pregnancy. John S. Santelli & Andrea J. Melnikas, "Teen Fertility in Transition: Recent and Historical Trends in the United States," 31 *Ann.*

*Rev. Pub. Health* 371, 375–76, 379 (2010). Because out-of-pocket expenditures on female contraceptives can be substantial for many women, see Su-Ying Liang et al., "Women's Out-of-Pocket Expenditures and Dispensing Patterns for Oral Contraceptive Pills Between 1996 and 2006," 83 *Contraception* 528, 531 (2011), the provision of such contraceptives without cost to the user can be expected to increase contraceptive use and so reduce the number both of unintended pregnancies and of abortions. See Jeffrey F. Peipert et al., "Preventing Unintended Pregnancies by Providing No-Cost Contraceptives," 120 *Obstetrics & Gynecology* 1291, 1295–96 (2012). Furthermore, "women who can successfully delay a first birth and plan the subsequent timing and spacing of their children are more likely than others to enter or stay in school and to have more opportunities for employment and for full social or political participation in their community." Susan A. Cohen, "The Broad Benefits of Investing in Sexual and Reproductive Health," 7 *Guttmacher Rep. on Public Policy*, March 2004, pp. 5, 6; see also Martha J. Bailey et al., "The Opt-in Revolution? Contraception and the Gender Gap in Wages," pp. 19, 26 (National Bureau of Econ. Research Working Paper No. 17922, 2012), www.nber.org/papers/w17922.pdf.

Like other universities, the University of Notre Dame provides health benefits to both its employees and its students. It self-insures its employees' medical expenses, but has hired Meritain Health, Inc. to administer the employee health plan without providing any insurance coverage (Meritain is therefore what is called a "third-party administrator" of a health plan). To take care of its students' medical needs, Notre Dame has a contract with Aetna (which happens to be Meritain's parent) that gives the students the option of ob-

taining health insurance from Aetna. Meritain administers coverage for some 4600 employees of Notre Dame (out of a total of 5200) and 6400 dependents of employees. Aetna insures 2600 students and 100 dependents; Notre Dame has about 11,000 students. But many of them have coverage under their parents' health insurance policies.

Because Catholic doctrine forbids the use of contraceptives (the "rhythm" method of avoiding pregnancy, which is permitted, is a form of abstention, not of contraception), Notre Dame has never paid for contraceptives for its employees or permitted Aetna to insure, under the Aetna Notre Dame Health Plan, Notre Dame students for the expense of contraceptives. Cognizant of the religious objections of Catholic institutions to contraception, and mindful of the dictate of the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb-1(a), (b), that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless "it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest," the government, some months after the enactment of the Affordable Care Act, created by administrative regulation a religious exemption from the guidelines. See "Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services," 76 Fed. Reg. 46621, 46626 (Aug. 3, 2011) (codified at 45 C.F.R. § 147.130(a)(1)(iv)); see also 77 Fed. Reg. 8725, 8727–29 (Feb. 15, 2012). But at first it was narrowly drafted and as a result excluded Catholic institutions that, like Notre Dame, are incorporated as nonprofit rather than religious institutions. That precipitated the filing in 2012 of a federal suit by Notre

Dame against the government, claiming that the contracep-
tive regulations infringed rights conferred on the university
by both the First Amendment and the Religious Freedom
Restoration Act, 42 U.S.C. § 2000bb-1. That suit was dis-
missed on standing and ripeness grounds, the government
having promised that Notre Dame wouldn't have to comply
with the regulations for one year, during which time new
regulations would be issued. *University of Notre Dame v. Se-
belius*, 2012 WL 6756332, at *3–4 (N.D. Ind. Dec. 31, 2012); see
"Certain Preventive Services Under the Affordable Care
Act," 77 Fed. Reg. 16501, 16502–03 (Mar. 21, 2012).

The new regulations were issued as promised—and, as
expected, they enlarged the exemption. See "Coverage of
Certain Preventive Services Under the Affordable Care Act,"
78 Fed. Reg. 39870, 39875–90 (July 2, 2013); 29 C.F.R.
§ 2590.715-2713A(a); 45 C.F.R. § 147.131(b). As a result, Notre
Dame now came within its scope. To exercise its right thus
conferred to opt out of having to pay for coverage for con-
traceptives, either directly or through a health insurer, such
as Aetna, the university had to fill out "EBSA Form 700—
Certification." See 45 C.F.R. § 147.131(b)(4). The form (www.
dol.gov/ebsa/pdf/preventiveserviceseligibleorganizationcer
tificationform.pdf) is short, its meat the following sentence:
"I certify that, on account of religious objections, the organi-
zation opposes providing coverage for some or all of any
contraceptive services that would otherwise be required to
be covered; the organization is organized and operates as a
nonprofit entity; and the organization holds itself out as a
religious organization." The form states that "the organiza-
tion or its plan must provide a copy of this certification to
the plan's health insurance issuer (for insured health plans)
or a third party administrator (for self-insured health plans)

in order for the plan to be accommodated with respect to the contraceptive coverage requirement." So Notre Dame was required to give copies both to Aetna and to the employee plan's third-party administrator, Meritain.

The Affordable Care Act requires providers of health insurance (including third-party administrators of self-insured health plans, even though they are conduits rather than ultimate payors of plan benefits) to pay for contraceptives for women, see 45 C.F.R. §§ 147.131(c)(2)(i)(B), (ii); 29 C.F.R. § 2590.715-2713A(b)(3); the form alerts Aetna and Meritain that since Notre Dame is not going to pay, *they* will have to pay. The companies have neither religious objections to paying for contraception nor financial objections. The government will reimburse at least 110 percent of the third-party administrator's (Meritain's) costs, 45 C.F.R. § 156.50(d)(3), and Aetna can expect to recoup its costs of contraceptive coverage from savings on pregnancy medical care, since there will be fewer pregnancies if contraception is more broadly available, at no cost, to Notre Dame's female employees and students, as well as from other regulatory offsets. See "Coverage of Certain Preventive Services Under the Affordable Care Act," *supra*, 78 Fed. Reg. at 39877–78.

The regulations require Aetna and Meritain, but not Notre Dame, to inform the university's female employees and students that those companies will be covering their contraceptive costs. See 26 C.F.R. § 54.9815-2713A(d); 29 C.F.R. § 2590.715-2713A(d). The companies may either "provide payments for contraceptive services" themselves or, alternatively, "arrange for an issuer or other entity to provide payments for" those services; either way, they may not "impos[e] any cost-sharing requirements (such as a copayment,

coinsurance, or a deductible), or impos[e] a premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries." 29 C.F.R. §§ 2590.715-2713A(b)(2), (c)(2). The regulations thus seek an accommodation between the secular interests that motivate the mandate to provide contraceptive services to women free of charge and the interests of religious institutions that provide health services. Accommodation is consistent with the balancing act required by the Religious Freedom Restoration Act ("substantial burden," "compelling governmental interest," "least restrictive means").

When the new regulations were promulgated in July of last year, Notre Dame did not at first bring a new suit (remember that its previous suit, brought when the university was excluded from opting out of contraceptive coverage, had been dismissed on jurisdictional grounds, and those grounds are irrelevant to a suit challenging the new regulations). Months passed. Not until December did the university file the present suit. The delay in suing was awkward, since the regulations were to take effect with respect to the employee health plan—and did take effect—on January 1 of this year. "Coverage of Certain Preventive Services Under the Affordable Care Act," *supra*, 78 Fed. Reg. at 39889. (The student health plan, however, the Aetna plan, has until August of this year to comply. See *id.*; University of Notre Dame, *2013–2014 Student Injury and Sickness Insurance Plan* 3, 5, http://uhs.nd.edu/assets/108455/nd_brochure_1314.pdf.)

With the January deadline for compliance with the regulations applicable to the employee plan looming, the university, less than a week after filing its second suit on December

3, moved for the entry of a preliminary injunction. The district court denied the motion on December 20, and Notre Dame filed its appeal from that denial the same day. On December 31, the last day before it would be penalized for violating the regulations, Notre Dame signed EBSA Form 700 and thereby opted out of paying for contraceptive coverage for its employees.

Because the appeal asks us to reverse the district court's denial of a preliminary injunction, we need to emphasize the limitations on our consideration of the appeal that result from its interlocutory character (that is, from the fact that it was before completion of the litigation in the district court). The lawsuit was only a few weeks old when the district judge suspended all proceedings in his court pending our consideration of the appeal. The parties have thus had little opportunity to present evidence. So the question before us is not whether Notre Dame's rights have been violated but whether the district judge abused his discretion in refusing to grant a preliminary injunction. That depends on such considerations as whether Notre Dame will experience irreparable harm if denied preliminary relief—that is, harm that cannot be eliminated by a final judgment in favor of Notre Dame—as well as on the likelihood that the university will win its case when the case is finally tried in the district court. *Kraft Foods Group Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 740–41 (7th Cir. 2013). We emphasize that with the evidentiary record virtually a blank, everything we say in this opinion about the merits of Notre Dame's claim and the government's (and intervenors') response is necessarily tentative, and should not be considered a forecast of the ultimate resolution of this still so young litigation.

An initial puzzle is that the university hasn't told us what exactly it wants enjoined at this stage in the litigation. It has gone ahead and signed the EBSA Form 700 and sent copies to Aetna and Meritain, and the latter has notified Notre Dame's employees of the contraceptive coverage that it is offering them. (Aetna has not notified the students; remember that it has until August to do so.) The university has thus complied with the statute, albeit under duress. The penalties for violating the applicable regulations are indeed stiff: $100 per day for "each individual to whom such failure relates," 26 U.S.C. § 4980D(b)(1), which would cost Notre Dame roughly $685,000 per day, assuming plausibly that half the 13,700 covered employees, students, and dependents are women—thus $250 million per year. There is an annual cap on such penalties of $500,000, but it is applicable only to un-intentional violations of the regulations. § 4980D(c)(3). If Notre Dame dropped its employee health plan, the penalty would be only $2,000 per full-time employee per year, 26 U.S.C. §§ 4980H(a), (c)(1), or roughly $10 million a year. That is well within Notre Dame's ability to pay but is still a number large enough to capture a university administrator's attention.

But we are left with the question: what does Notre Dame want *us* to do? Tell it that it can tear up the form without incurring a penalty for doing so, even though the government's regulations require the religious institution to retain it after signing it, 26 C.F.R. § 54.9815-2713A(a)(4), though not to submit it to the government? But what effect would that have—except to rescind the university's exemption from the requirement of paying for the contraceptive services that Meritain is now offering as a consequence of Notre Dame's choosing to exempt itself from the contraception regula-

tions? No certification, no exemption. We imagine that what the university wants is an order forbidding Aetna and Meritain to provide any contraceptive coverage to Notre Dame staff or students pending final judgment in the district court. But we can't issue such an order; neither Aetna nor Meritain is a defendant (the university's failure to join them as defendants puzzles us), so unless and until they are joined as defendants they can't be ordered by the district court or by this court to do anything. Furthermore, while a religious institution has a broad immunity from being required to engage in acts that violate the tenets of its faith, it has no right to prevent other institutions, whether the government or a health insurance company, from engaging in acts that merely offend the institution. *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450–51 (1988); *Bowen v. Roy*, 476 U.S. 693, 699–700 (1986).

The regulation to which Notre Dame takes the sharpest exception states that "the copy of the self-certification [EBSA Form 700] provided by the eligible [to opt out] organization [Notre Dame] to a third party administrator [Meritain] (including notice of the eligible organization's refusal to administer or fund contraceptive benefits) … shall be an instrument under which the plan is operated, [and] shall be treated as a designation of the third party administrator as the plan administrator under section 3(16) of ERISA for any contraceptive services required to be covered under § 2590.715-2713(a)(1)(iv) of this chapter to which the eligible organization objects on religious grounds." 29 C.F.R. § 2510.3-16. Notre Dame treats this regulation as making its mailing the certification form to its third-party administrator the *cause* of the provision of contraceptive services to its employees, in violation of its religious beliefs. Not so. Since

there is now a federal right, unquestioned by Notre Dame, to female contraceptive services, the effect of the university's exercise of its religious exemption is to throw the entire burden of administration of the right on the entities (Aetna and Meritain) that provide health services to Notre Dame's students and staff. The university is permitted to opt out of providing federally mandated contraceptive services, and the federal government determines (enlists, drafts, conscripts) substitute providers, and naturally they are the providers who are already providing health services to the university personnel.

Fearing the penalties for violating the contraceptive regulation, the university has complied and as a result Aetna and Meritain have been designated to provide the Notre Dame staff and students with female contraceptive services. Unlike the Little Sisters of the Poor, who filed their suit in September of last year, well before the January 1 deadline for compliance with the contraceptive regulation, and obtained a stay pending appeal—equivalent to a preliminary injunction—before having to comply, see *Little Sisters of the Poor Home for the Aged v. Sebelius*, 134 S. Ct. 893 (Dec. 31, 2013), Notre Dame filed suit at the last minute. It could have sued in July, when the regulations were amended to include Notre Dame as a religious organization entitled to continue refusing to pay for contraceptive services.

Still, Notre Dame's compliance has not mooted the case. One can imagine an alternative form of relief to turning the clock back; and being able to imagine an alternative form of relief is all that's required to keep a case alive after the primary relief sought is no longer available. *Hoosier Environmental Council v. U.S. Army Corps of Engineers*, 722 F.3d 1053,

1057–58 (7th Cir. 2013). For example, the university could ask the district court (because the case is before us on an interlocutory appeal, our ruling will not end the litigation) to order the government to notify all of Notre Dame's students and employees of the university's exemption from having to provide contraception and of its opposition to having to notify Aetna and Meritain of their duties under the Affordable Care Act with regard to contraceptive services.

But here we need to remind the reader that the only issue before us is whether Notre Dame is entitled to a preliminary injunction. It faces an uphill struggle for that relief. One reason is that "because of the uncertainty involved in balancing the considerations that bear on the decision whether to grant a preliminary injunction—an uncertainty amplified by the unavoidable haste with which the district judge must strike the balance—we appellate judges review his decision deferentially." *Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, 738 F.3d 786, 795 (7th Cir. 2013). Another obstacle is that a sine qua non for such relief is proof of irreparable harm if the injunction is denied: "A plaintiff seeking a preliminary injunction must establish that he is … likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)."For if the harm can be fully repaired in the final judgment, there is no reason to hurry the adjudicative process." *Kraft Foods Group Brands LLC v. Cracker Barrel Old Country Store, Inc.*, *supra*, 735 F.3d at 740. As we cannot figure out what Notre Dame wants in the way of preliminary relief, we cannot make a determination that it will suffer irreparable harm if we affirm the denial of such relief.

Another requirement for preliminary relief is that the plaintiff be likely to win its suit in the district court. The Supreme Court's decision in the *Winter* case states flatly that "a plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits." 555 U.S. at 20. So having explained the other objections to the appeal let's turn to the merits.

Notre Dame's principal claim is that by requiring the university to fill out EBSA Form 700 and give copies to Aetna and Meritain, the government has "substantially burden[ed] a person's exercise of religion" (the university is a nonprofit corporate "person"; cf. 1 U.S.C. § 1; *Korte v. Sebelius*, 735 F.3d 654, 674 (7th Cir. 2013)), and that no "compelling governmental interest" justifies that burdening. Religious Freedom Restoration Act, *supra*. But the university has not yet shown that there is a substantial burden. The form is two pages long—737 words, most of it boring boilerplate; the passages we quoted earlier, the only ones of consequence, consist of only 95 words. Signing the form and mailing it to Meritain and Aetna could have taken no more than five minutes. The university claims that there are other paperwork requirements; there aren't. The only colorable burden it complains about has nothing to do with time or cost; it is that by filling out the form and sending it to the companies it "triggers" their coverage of the contraception costs of the university's female employees and students, and that this makes the university an accomplice in the provision of contraception, in violation of Catholic doctrine, which in the name of avoiding "scandal" forbids the encouragement (equivalent to aiding and abetting) of sinful acts.

The "trigger" theory was stated clearly, which is not to say convincingly, in a recent district court decision where we read that "the self-certification form requires the [religious] organizations to do much more than simply protest or object. The purpose of the form is to enable the provision of the very contraceptive services to the organization's employees that the organization finds abhorrent." *East Texas Baptist University v. Sebelius*, 2013 WL 6838893, at *20 (S.D. Tex. Dec. 27, 2013). The key word is "enable," and it's inaccurate. Federal law, not the religious organization's signing and mailing the form, requires health-care insurers, along with third-party administrators of self-insured health plans, to cover contraceptive services. By refusing to fill out the form Notre Dame would subject itself to penalties, but Aetna and Meritain would still be required by federal law to provide the services to the university's students and employees unless and until their contractual relation with Notre Dame terminated. (Obviously if they were no longer providing any health benefits to the university's students and staff they would not be providing them with any contraceptive services or coverage.)

Notre Dame says no—that had it not filled out the form, Meritain and Aetna wouldn't have been *authorized* to provide contraceptive services because neither would have been a "plan administrator" under section 3(16) of ERISA, 29 U.S.C. § 1002(16), and thus would not have been plan fiduciaries entitled to make expenditures (as for costs of contraceptives) on behalf of the plan. As the plan's sponsor, Notre Dame is alone authorized to designate a plan fiduciary, 29 U.S.C. § 1102(a)(2), and it made that designation in the form and thus is complicit in the provision of contraceptives to the university's students and staff.

This argument was made for the first time at oral argument, and so has been forfeited. In any event it's unconvincing. For one thing it fails to distinguish between Meritain and Aetna—the latter is the students' health insurer and so already a plan fiduciary, 29 U.S.C. § 1002(21)(A), and therefore required by the Affordable Care Act to provide (come August) contraceptive coverage to plan members whether or not Notre Dame signs the form. 45 C.F.R. §§ 147. 130(a)(1)(iv), 147.131(f). Even as to Meritain, although "many agreements between third party administrators and plan sponsors prohibit third party administrators from serving as fiduciaries," "Coverage of Certain Preventive Services Under the Affordable Care Act," *supra*, 78 Fed. Reg. at 39879, "many" is not "all" or even "most." Notre Dame has presented no evidence that its contract with Meritain forbids the latter to be a plan fiduciary.

Moreover, the university has not been told to name Meritain as a plan fiduciary. Rather, the signed form "*shall be treated as* a designation of the third party administrator as the plan administrator under section 3(16) of ERISA for any contraceptive services required to be covered." 29 C.F.R. § 2510.3-16(b) (emphasis added). Treated and designated by whom? By the government. The delivery of a copy of the form to Meritain reminds it of an obligation that the *law*, not the university, imposes on it—the obligation to pick up the ball if Notre Dame decides, as is its right, to drop it. Notre Dame's signing the form no more "triggers" Meritain's obligation to provide contraceptive services than a tortfeasor's declaring bankruptcy "triggers" his co-tortfeasors' joint and several liability for damages. Meritain must provide the services no matter what; signing the form simply shifts the financial burden from the university to the government.

The parties have not told us the terms of Notre Dame's contracts with these providers. For all we know, the contracts permit the university at any time to "disable" them from providing medical services, including contraceptive services, simply by ceasing to do business with them. Students and employees would make their own health insurance arrangements—most students already do (76 percent), and so do many staff (12 percent). Notre Dame would be off the hook without having to sign the certification form.

The following example may help make clear the fallacy in Notre Dame's "triggering" metaphor. Suppose the United States, like Canada and many other foreign nations, had a "single payer" health care system. That means the government pays the cost of covered medical services (if the United States had such a system, it would be the equivalent of Medicare for everyone), rather than employers, health insurers, and patients, though patients may in a single-payer system be charged directly for some of the expense of the medical care provided by the system, as distinct from indirectly through taxes. Now suppose our hypothetical single-payer system paid the full expense of female contraceptives. We don't think Notre Dame would argue that the system placed a "substantial burden" on the university's compliance with Catholic doctrine. Notre Dame does not deny the existence of legitimate secular interests, some noted at the outset of this opinion, that can justify a federal program of paying for medical expenses, including contraceptive expenses. (For a summary of those interests, see "Coverage of Certain Preventive Services Under the Affordable Care Act," *supra*, 78 Fed. Reg. at 39872–73.) In fact we *know* it wouldn't object, at least on religious grounds, because it advised the district court that one method by which the government could

"achieve its asserted interests without forcing Notre Dame to violate its religious beliefs" would be for the government to "directly provide contraceptive[s]" to the university's staff and students and another method would be for it to "directly offer insurance coverage for contraceptive services": in either case a single-payer system, at least for contraceptives. The main difference between such a system and the Affordable Care Act is that under the Act the government—instead of providing medical services directly—uses private insurance providers and health plan administrators, such as Aetna and Meritain, as its agents to provide medical services, subsidized by the government.

If the government is entitled to require that female contraceptives be provided to women free of charge, we have trouble understanding how signing the form that declares Notre Dame's authorized refusal to pay for contraceptives for its students or staff, and mailing the authorization document to those companies, which under federal law are obligated to pick up the tab, could be thought to "trigger" the provision of female contraceptives.

Consider this further example illustrative of our doubts. Suppose it is wartime, there is a draft, and a Quaker is called up. Many Quakers are pacifists, and their pacifism is a tenet of their religion. Suppose the Quaker who's been called up tells the selective service system that he's a conscientious objector. The selective service officer to whom he makes this pitch accepts the sincerity of his refusal to bear arms and excuses him. But as the Quaker leaves the selective service office, he's told: "you know this means we'll have to draft someone in place of you"—and the Quaker replies indignantly that if the government does that, it will be violating

his religious beliefs. Because his religion teaches that *no one* should bear arms, drafting another person in his place would make him responsible for the military activities of his replacement, and by doing so would substantially burden his own sincere religious beliefs. Would this mean that by exempting him the government had forced him to "trigger" the drafting of a replacement who was not a conscientious objector, and that the Religious Freedom Restoration Act would require a draft exemption for both the Quaker and his non-Quaker replacement? That seems a fantastic suggestion. Yet confronted with this hypothetical at the oral argument, Notre Dame's counsel acknowledged its applicability and said that drafting a replacement indeed would substantially burden the Quaker's religion.

Another way to see the error of thinking that by signing the certification form Notre Dame was "enabling" Aetna and Meritain to violate its religious freedom is to ask what would happen if the university refused to sign the form while adhering to its long-standing refusal to pick up any part of the cost of contraceptives. The answer is that the female employees and students would still have a federal right to free contraceptives from Meritain and Aetna unless Notre Dame stopped offering health services to its students entirely. Health groups would lose no time in acquainting those employees and students with their federal rights.

To nail down the fallacy of the "trigger" or "enablement" interpretations of the certification form we need only parse carefully its instructions—the statement that "the organization or its plan must provide a copy of this certification to the plan's health insurance issuer (for insured health plans) or a third party administrator (for self-insured health plans)

*in order for the plan to be accommodated with respect to the contraceptive coverage requirement*" (emphasis added). Remember that "accommodation" in this context means accommodating the Affordable Care Act to religious beliefs. The accommodation in this case consists in the organization's (that is, Notre Dame's) washing its hands of any involvement in contraceptive coverage, and the insurer and the third-party administrator taking up the slack under compulsion of federal law. Notre Dame is telling Aetna and Meritain: "we're excused from the new federal obligation relating to contraception," and in turn, the government tells those insurance companies "but you're not." This is a warning, not a trigger. It enables nothing. The sole "enabler" is the federal statute that Notre Dame has been allowed to opt out of.

The university argues alternatively that if the form isn't a trigger, its health plans are the "conduit" through which the employees and students obtain contraceptive coverage, making Notre Dame complicit in sin. But the university's lawyer told us at oral argument that his client would have no problem if each of its female employees signed and mailed to Meritain (and its students mailed to Aetna) a form saying "I have insurance through Notre Dame, but the university won't cover contraceptive services, so now you must cover them." We can't see how that would make the health plan less of a "conduit."

The university has still another argument: that the contraception regulation imposes a substantial burden on it by forcing the university to "identify[] and contract[] with a third party willing to provide the very services Notre Dame deems objectionable." It's true that Meritain could exit its contract with Notre Dame without liability if it didn't want

to provide contraceptive services. See "Coverage of Certain Preventive Services Under the Affordable Care Act," *supra*, 78 Fed. Reg. at 39880. But as Meritain does not object to providing them and is doing so already, the "burden" alleged by Notre Dame is entirely speculative and so not a ground for equitable relief. See *City of Los Angeles v. Lyons*, 461 U.S. 95, 104–05 (1983).

The novelty of Notre Dame's claim—not for the exemption, which it has, but for the right to have it without having to ask for it—deserves emphasis. United States law and public policy have a history of accommodating religious beliefs, as by allowing conscientious objection to the military draft—and now exempting churches and religious institutions from the Affordable Care Act's requirements of coverage of contraceptive services. What makes this case and others like it involving the contraception exemption paradoxical and virtually unprecedented is that the beneficiaries of the religious exemption are claiming that the exemption process itself imposes a substantial burden on their religious faiths. The closest analogues we have found are cases in which churches seeking rezoning or variances claim that the process for obtaining permission is so cumbersome as to constitute a substantial burden on religious practice. E.g., *Saints Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 901 (7th Cir. 2005), and cases cited there. Consider also *United States v. Friday*, 525 F.3d 938, 947–48 (10th Cir. 2008), in which a member of a tribe had been prosecuted for killing, without a permit to do so, a bald eagle, for use in a religious ceremony. The court expressed skepticism that the permitting process itself might have imposed a *substantial* burden on a religious exercise. Cf. *United States v. Oliver*, 255 F.3d 588, 589 (8th Cir. 2001) (per curiam).

The process of claiming one's exemption from the duty to provide contraceptive coverage is the opposite of cumbersome. It amounts to signing one's name and mailing the signed form to two addresses. Notre Dame may consider the process a substantial burden, but substantiality—like compelling governmental interest—is for the court to decide. *Mahoney v. Doe*, 642 F.3d 1112, 1121 (D.C. Cir. 2011). Otherwise there would have been no need for Congress in the Religious Freedom Restoration Act to prefix "substantial" to "burden."

Notre Dame can derive no support from our decision in *Korte v. Sebelius*, 735 F.3d 654 (7th Cir. 2013), heavily cited in the university's briefs. The question in that case was whether two for-profit companies that had health plans for their employees could refuse, because of the religious beliefs of their Catholic owners, to comply with the contraceptive regulation. We ordered the district court to enter a preliminary injunction against enforcing the mandate against the employers. But Notre Dame is *authorized* to refuse, and it *has* refused. Provided it overcomes the intervenors' "sincerity" attack in the district court when the litigation resumes there (see below), it will be in the same position that we allowed the company owners in the *Korte* case to occupy pending the resolution of their case: fully entitled to thumb its nose at the contraceptive regulation.

We need to say something about the three Notre Dame students whom we have allowed to intervene. They had filed a timely motion in the district court to intervene in that court under Fed. R. Civ. P. 24. Having stayed the litigation pending the resolution of this appeal, the district judge did not rule on it, so the students moved for leave to intervene in

this court. Although the Federal Rules of Appellate Procedure do not provide for intervention other than in cases involving review of certain administrative rulings, intervention is permitted in other cases as a matter of federal common law, with Rule 24 supplying the standard for determining whether to permit intervention in a particular case. *Automobile Workers v. Scofield*, 382 U.S. 205, 217 n. 10 (1965); *Sierra Club, Inc. v. EPA*, 358 F.3d 516, 517–18 (7th Cir. 2004). The student intervenors in our case express concern that the university is seeking to obtain a ruling from this court that may thwart their right to contraception under the Affordable Care Act. The concern is natural though perhaps exaggerated, since Notre Dame has complied fully with the Act, but we decided that the concern was sufficient to warrant intervention. And we decided to permit the intervenors to participate under pseudonyms because of the privacy interest involved in contraceptive use and their concern that they might be subjected to harassment were their identities revealed. When the litigation in the district court resumes, they presumably will be allowed to intervene in the district court.

In the brief they've filed in this court they say they intend, when litigation in the district court resumes, to press the issue of "sincerity." To obtain the contraceptive exemption, or other exemptions from secular requirements, the leadership of a religious organization must actually believe, not simply pretend, that its religious teachings require the exemption. See, e.g., *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 428–29 (2006); *International Society for Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430, 441 (2d Cir. 1981). Although the government has not questioned Notre Dame's sincerity, the intervenors' brief has. It inti-

mates that a plausible inference from the timing and tactics employed by Notre Dame in this litigation is that in challenging the contraception regulation the university is responding to outside pressures. We express no opinion on whether the intervenors will be able to substantiate their doubts about the sincerity of Notre Dame's opposition to the use of contraceptives, when, upon the resumption of the litigation in the district court, they have an opportunity to present evidence.

For now the important point is that Notre Dame has failed to demonstrate a substantial burden. We find support for this conclusion in Judge David Tatel's dissent from the grant (made without accompanying explanation) of an injunction pending appeal in *Priests for Life v. U.S. Dep't of Health & Human Services*, No. 13-5368, and *Roman Catholic Archbishop of Washington v. Sebelius*, No. 13-5371 (D.C. Cir. Dec. 31, 2013) (per curiam):

> Because Congress has imposed an independent obligation on insurers to provide contraceptive coverage to Appellants' employees, those employees will receive contraceptive coverage from their insurers *even if* Appellants self-certify—but not *because* Appellants self-certify. … In other words, it was Congress that "authorized" insurers to provide contraceptive coverage to Appellants' employees— services those employees will receive regardless of whether Appellants self-certify.
>
> … Although we must accept Appellants' assertion that the scheme itself violates their religious beliefs, we need not accept their legal conclusion that their purported involvement in that scheme qualifies as a substantial burden under RFRA. *Cf. Kaemmerling v. Lappin*, 553 F.3d 669, 679 (D.C. Cir. 2008) ("Accepting as true the factual allegations

that Kaemmerling's beliefs are sincere and of a religious nature—but not the legal conclusion, cast as a factual allegation, that his religious exercise is substantially burdened—we conclude that Kaemmerling does not allege facts sufficient to state a substantial burden on his religious exercise."). Appellants' participation is limited to complying with an administrative procedure that establishes that they are, in effect, exempt from the very requirements they find offensive. *See id.* at 678 ("An inconsequential or de minimis burden on religious practice does not rise to [the level of a substantial burden under RFRA], nor does a burden on activity unimportant to the adherent's religious scheme."). At bottom, then, Appellants' religious objections are to the government's independent actions in mandating contraceptive coverage, not to any action that the government has required Appellants themselves to take. But Appellants have no right to "require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens." *Bowen v. Roy*, 476 U.S. 693, 699 (1986). Religious organizations are required to file many forms with the government, such as applications for tax exemptions, even though they may have religious objections to a whole host of government policies and programs.

*Id.* at 3–4 (emphases in original). See also Judge Jackson's district court decision in the *Roman Catholic Archbishop* case, denying preliminary relief. 2013 WL 6729515 (D.D.C. Dec. 20, 2013).

Notre Dame doesn't place all its eggs in the RFRA "substantial burden" basket, but only two of its other arguments warrant discussion. (The rest add nothing to its RFRA arguments.) The first is that the exemption for religious employers (essentially churches, as distinct from other religious

organizations, such as Catholic universities, see 45 C.F.R. § 147.130(a)(1)(iv)(B)) violates the establishment clause of the First Amendment because it favors certain types of religious organizations (churches or other houses of worship) over others (like Notre Dame). The religious employer doesn't have to sign or mail a certification form in order to claim its exemption; its exemption from the contraceptive guideline appears to be automatic. See, e.g., 45 C.F.R. § 147.130 (a)(1)(iv)(A); U.S. Health Resources & Services Administration, "Women's Preventive Services Guidelines," *supra*; U.S. Department of Labor, "Affordable Care Act Regulations and Guidance," www.dol.gov/ebsa/healthreform/regulations/ coverageofpreventiveservices.html. But religious employers, defined as in the cited regulation, have long enjoyed advantages (notably tax advantages) over other entities, 26 U.S.C. §§ 6033(a)(3)(A)(i), (iii), without these advantages being thought to violate the establishment clause. See, e.g., *Walz v. Tax Commission of City of New York*, 397 U.S. 664, 666, 672–73 (1970). The establishment clause does not require the government to equalize the burdens (or the benefits) that laws of general applicability impose on religious institutions. A law exempting churches or other religious property from property taxes will benefit religious denominations that own a great deal of property, to the disadvantage of denominations with modest property holdings (such as storefront churches). This unequal effect does not condemn the law.

Notre Dame's second non-RFRA claim, which is more substantial, is that the regulations violate the free-speech clause of the First Amendment by providing that an exempt organization, such as Notre Dame, "must not, directly or indirectly, seek to interfere with a third party administrator's arrangements to provide or arrange separate payments for

contraceptive services for participants or beneficiaries, and must not, directly or indirectly, seek to influence the third party administrator's decision to make any such arrangements." 29 C.F.R. § 2590.715-2713A(b)(1)(iii); 26 C.F.R. § 54.9815-2713A(b)(1)(iii). Obviously there are forms of "influence" that are not protected by the speech, press, or petition for redress of grievances clauses of the First Amendment. But most speech or writing intended to influence someone's decision—to persuade someone to do or not do something—*is* protected.

There is a great variety of female contraceptives, see U.S. Food & Drug Administration, "Birth Control; Medicines To Help You," www.fda.gov/forconsumers/byaudience/forwomen/freepublications/ucm313215.htm, including a great variety just of contraceptive pills. Mayo Clinic, "Choosing a Birth Control Pill," www.mayoclinic.org/best-birth-control-pill/art-20044807. Notre Dame's student health service might have views concerning the relative medical risks of different female contraceptives; it would certainly be entitled to communicate those views to its third-party administrator, Meritain. It's true that the regulation requires provision of "all" FDA-approved female contraceptives, but the health service could try to persuade the administrator to recommend to the physicians in its network one FDA-approved drug over another, such as progestin IUDs over copper ones, or even to advise the FDA to alter its list of approved female contraceptives. The university has a responsibility for the health and safety of its students and staff.

A footnote in the commentary to the regulation states that "nothing in these final regulations prohibits an eligible organization from expressing its opposition to the use of

contraceptives." "Coverage of Certain Preventive Services Under the Affordable Care Act," *supra*, 78 Fed. Reg. at 39880 n. 41. That's not very reassuring. The example we gave was not of a statement of opposition to the use of contraceptives, but of a statement intended to influence the choice of contraceptives that the third-party administrator or the health insurance provider would cover. The footnote is an unsatisfactory afterthought.

Against this it can be argued that the regulation is only about "payments," and not about the provision of contraceptives, as in our example of student health services' being concerned with the safety of particular contraceptives. At the oral argument the government's lawyer said that the regulation, despite its wording, is not limited to wrangling over payments; that it also concerns the provision of contraceptives, as in our example of an attempt at influence that cannot be prohibited without infringing freedom of speech. The regulations specify the contraceptives that health plans must provide for women—namely "all Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity," U.S. Health Resources & Services Administration, "Women's Preventive Services Guidelines," *supra*—and the government's lawyer seemed (no stronger word is possible) to imply that for Notre Dame to urge a plan not to provide a specific such contraceptive, even because of a sincere health concern by the university, would violate the "influence" regulation.

We're troubled by the seeming vagueness of the regulation as drafted and as further muddied by the footnote in the commentary (why isn't it in the regulation itself?), and we

fear that it may have pernicious consequences if understood to forbid or inhibit the kind of discussion between the university and the contraceptives providers sketched in the preceding paragraphs. But the parties have failed to place the issue in focus. Notre Dame hasn't told us what it wants to say but fears to say (except that it at least wants to be able to tell Meritain not to provide contraceptive coverage at all—which sounds like urging civil disobedience) and the government hasn't clearly embraced an interpretation of the regulation that would give rise to the concerns we've expressed. The issue must, for now, be left for further exploration in the district court.

Two loose ends remain to be tied up. They relate to motions that Notre Dame filed in this court after filing its appeal but before oral argument. First was a motion it filed on January 20, six days after the students' motion to intervene was granted, asking us to dismiss its appeal or in the alternative to order a limited remand to the district court; the stated purpose of either alternative was to provide Notre Dame with an opportunity to depose the three student intervenors. We took the motion under advisement, the appeal having been scheduled for imminent oral argument with expedited briefing underway and the intervenors having not yet filed their brief, which made the motion premature. It was apparent that the appeal would be refiled after discovery relating to the intervenors or resumed if we ordered a limited remand in lieu of dismissal. So dismissal or remand would be an interruption rather than a termination—a source of delay harmful to both parties and disruptive of this court's schedule.

We have the authority to dismiss an appeal at the appellant's request. Fed. R. App. P. 42(b); *United States v. Hagerman*, 549 F.3d 536, 538 (7th Cir. 2008). But it is authorization, not command. E.g., *Albers v. Eli Lilly & Co.*, 354 F.3d 644, 646 (7th Cir. 2004) (per curiam). As in the case just cited, here we have thought it "best … to carry through so that the investment of public resources already devoted to this litigation will have some return." So the motion has remained pending, and is now moot in light of our affirming the denial of preliminary relief to Notre Dame.

On January 28 the university filed a renewed motion for an injunction pending appeal—it had filed such a motion on December 23, but we had denied that motion a week later when we ordered expedited briefing of the appeal. The sole ground for the renewed motion was the Supreme Court's order of January 24 in the *Little Sisters* case, 2014 WL 272207. That ground was an odd one for Notre Dame to assert, because the university disagrees with the Court's order. The Court's order conditioned the injunction pending appeal in that case on the Little Sisters' sending a letter to the government declaring its opposition to paying for contraceptive services—and at the oral argument of our case Notre Dame told us that it would consider sending such a letter an infringement of its religious freedom. Another distinction between that case and this one is that unlike Meritain, Little Sisters' third-party administrator, Christian Brothers, is a "church plan" administrator and so wouldn't provide contraceptive services anyway, or be required to do so. We now deny the renewed motion for an injunction pending appeal as moot because the appeal has been resolved.

Chief Judge Simon's denial of preliminary relief in the district court is

AFFIRMED.

FLAUM, *Circuit Judge,* dissenting. While Notre Dame's appeal from the district court's denial of a preliminary injunction was pending before this court, we granted the students' motion to intervene. Notre Dame then moved to dismiss the appeal in order to conduct additional discovery in the district court. Dismissal would not prejudice the government or the student-intervenors. Nor would it inhibit this court's review of the ultimate issues at a later stage in the proceedings. Because I see no reason not to "accept plaintiffs' decision to proceed to trial without interim relief," *Creaton v. Heckler*, 781 F.2d 1430, 1431 (9th Cir. 1986), I would grant Notre Dame's motion and dismiss this appeal.

The majority does not agree, however, and so the appeal remains before us. Faced with the merits, I conclude that Notre Dame has made out a credible claim under the Religious Freedom Restoration Act. I therefore would grant the university a preliminary injunction forbidding the government from penalizing Notre Dame for refusing to comply with the self-certification requirement.

## I.

Notre Dame filed an emergency motion for an injunction pending appeal on December 23, 2013. At that point, its attention was fixed on the looming January 1, 2014 deadline, the date that the mandate and relevant regulations would go into effect. The court denied the motion on December 30 and ordered expedited briefing. The following day, the university—"forced," in its words, "to choose between potentially ruinous fines and compliance with the Mandate"—opted to submit its self-certification form while it continued to litigate this appeal. *See Notre Dame Issues Statement on Contraceptive Care Injunction Denial*, WNDU.com (Dec. 31, 2013), available

at http://tinyurl.com/kyhn6op (last visited Feb. 20, 2014). On
January 14, the day after Notre Dame filed its opening brief,
the court granted the students' motion to intervene. The stu-
dents intended to, and in fact later did, advance a number of
arguments that the government had not pursued in the dis-
trict court. Shortly thereafter, Notre Dame moved to dismiss
its appeal. The government took no position on the motion
for voluntary dismissal, and the students opposed it. The
motion was taken under advisement.

Federal Rule of Appellate Procedure 42 permits us to
dismiss an already-docketed appeal "on the appellant's mo-
tion on terms agreed to by the parties or fixed by the court."
Fed. R. App. P. 42(b). Even where the parties do not agree on
terms, we apply a "presumption in favor of dismissal," *Al-
bers v. Eli Lilly & Co.*, 354 F.3d 644, 646 (7th Cir. 2004)—as
well we should, for normally it makes very little sense to
force an appellant into court against his will. This presump-
tion would appear to be stronger when the appeal is an in-
terlocutory one. Such a dismissal will not prejudice any fu-
ture determination on the merits and will put the appellee in
no worse position than if the appellant had not taken an ap-
peal to begin with. At the same time, however, this presump-
tion may be overcome by other prudential considerations.
Appellate review is not a "bargaining chip" to be played and
then casually conceded after a bad card is dealt. *Id.* (citing
*U.S. Bancorp Mortgage Co. v. Bonner Mall P'ship*, 513 U.S. 18
(1994)).

Invoking the *Albers* case, the student-intervenors accuse
Notre Dame of "procedural gamesmanship" for moving to
dismiss the appeal after its pleas for urgent relief earlier in
the litigation. But for Notre Dame, the circumstances of this

case changed significantly on January 1, by which point the expedited briefing schedule had already been set. They changed yet again on January 14, when the student-intervenors entered the case. Certainly Notre Dame is not the first party to reassess the wisdom of taking an appeal in light of later developments. *Cf. Tyndale House Publishers, Inc. v. Sebelius*, No. 13-5108, 2013 WL 2395168 (D.C. Cir. May 3, 2013) (granting the government's opposed motion for voluntary dismissal in a contraceptive-mandate case brought by a for-profit religious employer). In my judgment, if the university is willing to return to the district court and forego any chance at a preliminary injunction, we should not hold it to an expedited schedule that it did not request and to an appeal involving parties and arguments that it did not anticipate.

Importantly, Notre Dame has not "sought dismissal for the purpose of evading appellate determination." *United States v. Wash. Dep't of Fisheries*, 573 F.2d 1117, 1118 (9th Cir. 1978). To the contrary, the university tells us that it "fully expects to be back in this Court—either from its appeal or the Government's appeal … following the district court's ruling on a permanent injunction." This is a far cry from a case like *Albers*, where counsel for the appellant "essentially conced[ed]" that he decided after oral argument to dismiss the appeal for opportunistic reasons, in order to "try again, with a different client, at a different time or in a different court." 354 F.3d at 646.

This case is also very much unlike *United States v. Hagerman*, where we denied an imputed motion for voluntary dismissal because it arose "with the appeal fully briefed and the merits free from doubt." 549 F.3d 536, 538 (7th Cir. 2008).

Notre Dame requested dismissal a week before the govern-
ment's and intervenors' briefs were due; Notre Dame's reply
brief (which addressed a number of the intervenors' new ar-
guments) was due a week after that. More to the point, and
with respect for my colleagues' views, I do not find the ques-
tion in this case to be clear cut. There have been nineteen
cases challenging the application of the mandate to religious
nonprofits to date, and every plaintiff besides Notre Dame
has received an injunction.[1] In contrast to *Hagerman*, the mer-

---

[1] Most plaintiffs received a preliminary injunction in the district court.
*See Ave Maria Found. v. Sebelius*, No. 13-cv-15198, 2014 WL 117425 (E.D.
Mich. Jan. 13, 2014); *Catholic Diocese of Beaumont v. Sebelius*, No. 1:13-cv-
709, 2014 WL 31652 (E.D. Tex. Jan. 2, 2014); *Roman Catholic Diocese of Fort
Worth v. Sebelius*, No. 4:12-cv-314 (N.D. Tex. Dec. 31, 2013) (Doc. 99);
*Sharpe Holdings, Inc. v. U.S. Dep't of Health & Human Servs.*, No. 2:12-cv-
92, 2013 WL 6858588 (E.D. Mo. Dec. 30, 2013); *Diocese of Fort Wayne-S.
Bend v. Sebelius*, No. 1:12-cv-159, 2013 WL 6843012 (N.D. Ind. Dec. 27,
2013); *Grace Schs. v. Sebelius*, No. 3:12-cv-459, 2013 WL 6842772 (N.D. Ind.
Dec. 27, 2013); *E. Tex. Baptist Univ. v. Sebelius*, No. H-12-3009, 2013 WL
6838893 (S.D. Tex. Dec. 27, 2013); *S. Nazarene Univ. v. Sebelius*, No. 13-
1015, 2013 WL 6804265 (W.D. Okla. Dec. 23, 2013); *Geneva Coll. v. Sebelius*,
No. 12-0207, 2013 WL 6835094 (W.D. Pa. Dec. 23, 2013); *Reaching Souls
Int'l, Inc. v Sebelius*, No. 13-1092, 2013 WL 6804259 (W.D. Okla. Dec. 20,
2013); *Legatus v. Sebelius*, No. 12-12061, 2013 WL 6768607 (E.D. Mich. Dec.
20, 2013); *Roman Catholic Archdiocese of N.Y. v. Sebelius*, No. 12-2542, 2013
WL 6579764 (E.D.N.Y. Dec. 16, 2013); *Zubik v. Sebelius*, No. 2:13-cv-1459,
2013 WL 6118696 (W.D. Pa. Nov. 21, 2013). A handful lost in the district
court but later received an injunction on appeal. *See Little Sisters of the
Poor v. Sebelius*, No. 13-cv-2611, 2013 WL 6839900 (D. Colo. Dec. 27, 2013),
*injunction pending appeal granted*, No. 13A691 (U.S. Jan. 24, 2014); *Mich.
Catholic Conf. v. Sebelius*, No. 1:13-CV-1247, 2013 WL 6838707 (W.D. Mich.
Dec. 27, 2013), *injunction pending appeal granted*, No. 13-2723 (6th Cir. Dec.
31, 2013); *Catholic Diocese of Nashville v. Sebelius*, No. 3:13-1303, 2013 WL
6834375 (M.D. Tenn. Dec. 26, 2013), *injunction pending appeal granted*, No.
13-6640 (6th Cir. Dec. 31, 2013); *Roman Catholic Archbishop of Wash. v.*

its in this case are hardly "free from doubt." *Id.* I suggest that granting the motion to dismiss the appeal is the more prudential approach.

## II.

On the merits, I believe that Notre Dame has made out a credible claim that the Patient Protection and Affordable Care Act and accompanying regulations are a substantial burden on its exercise of religion. Accordingly, I would grant the university's request for a preliminary injunction. *See Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011) (setting forth the legal standard for a preliminary injunction); *cf. ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012) (noting that the "loss of First Amendment freedoms, for even minimal periods of time," constitutes an irreparable injury for which damages are not an adequate remedy).

The Religious Freedom Restoration Act provides that a federal law may not "substantially burden a person's exercise of religion" unless the government "demonstrates that application of the burden to the person … is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1. For purposes of this litigation, the government concedes that the least-restrictive-means exception does not apply, so we need only decide

---

*Sebelius*, No. 13-1441, 2013 WL 6729515 (D.D.C. Dec. 20, 2013), *injunction pending appeal granted*, No. 13-5371 (D.C. Cir. Dec. 31, 2013); *Priests for Life v. U.S. Dep't of Health & Human Servs.*, No. 13-1261, 2013 WL 6672400 (D.D.C. Dec. 19, 2013), *injunction pending appeal granted*, No. 13-5371 (D.C. Cir. Dec. 31, 2013).

whether the burden that the Affordable Care Act imposes on Notre Dame is substantial.

In *Korte v. Sebelius*, this court said that a substantial burden arises "when the government 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" 735 F.3d 654, 682 (7th Cir. 2013) (quoting *Thomas v. Review Bd. of Ind. Emp't Div.*, 450 U.S. 707, 718 (1981)). Put another way, government action substantially burdens religious exercise if it "necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise … effectively impracticable." *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003) (interpreting a parallel provision in the Religious Land Use and Institutionalized Persons Act).

It is clear that if Notre Dame were forced to pay for contraceptive coverage against its religious beliefs or else incur significant monetary penalties, this would be a substantial burden. *See Korte*, 735 F.3d at 682–85. Unlike the for-profit plaintiffs in *Korte*, however, the university has an additional choice: a specially crafted accommodation "whereby the objecting employer gives notice to its insurance carrier and the insurer issues a separate policy with the mandated coverage." *Id.* at 662. This accommodation permits a religious organization to discharge its obligations to provide contraceptive coverage by "self-certif[ying], in a form and manner specified by the [government]," that the organization "opposes providing coverage for some or all … contraceptive services … on account of religious objections," "is organized and operates as a nonprofit entity," and "holds itself out as a religious organization." 26 C.F.R. § 54.9815-2713A(a). Among other things, the organization must provide a copy

of the self-certification form, known as EBSA Form 700, to its insurance issuer or third-party administrator; those entities are then required to offer segregated contraceptive services directly to plan participants and beneficiaries. *Id.* § 54.9815-2713A(b)–(c). However, if the organization does not self-certify—and also does not provide the required, religiously objectionable coverage—it continues to face the same "ruinous fines" that constituted a substantial burden in *Korte*. 735 F.3d at 684.

I do not question that the accommodation is the government's good-faith attempt to meet religious objectors half-way, and it makes this a somewhat closer case than *Korte*. Nevertheless, by putting substantial pressure on Notre Dame to act in ways that (as the university sees it) involve the university in the provision of contraceptives, I believe that the accommodation still runs afoul of RFRA.

The district court reasoned that the self-certification scheme is not a substantial burden because the scheme does not require the university to modify its behavior in any way. According to the court, "Notre Dame need only step aside from contraception coverage, as it has always done and most assuredly would always do." Similarly, the government tells us that by self-certifying, the university "is simply completing a form conveying that the University does not intend to provide contraceptive coverage."

I do not view the required act so mechanistically. The accommodation does not merely require the religious organization to "step aside from contraceptive coverage." It requires the organization to perform a new act that it did not have to perform before: completing and delivering to its insurer or third-party administrator the official EBSA Form

700. In the university's eyes, this form's "purpose and effect"—evident from the face of the regulations—"is to accomplish what the organization finds religiously forbidden and protests." *E. Tex. Baptist Univ. v. Sebelius*, No. H-12-3009, 2013 WL 6838893, at *20 (S.D. Tex. Dec. 27, 2013). As to health plans administered by third-party administrators in particular, the form flatly states that it is "an instrument under which the plan is operated." Having to submit the EBSA Form 700, Notre Dame maintains, makes it "complicit in a grave moral wrong" by involving it with a system that delivers contraceptive products and services to its employees and students.

The majority has trouble accepting this position, in part due to the university's statement that its signature will "trigger" contraceptive coverage, because the majority understands federal law to require contraceptive coverage regardless of what Notre Dame signs or does not sign. *But see Roman Catholic Archbishop of Wash. v. Sebelius*, No. 13-1441, 2013 WL 6729515, at *17, *22 (D.D.C. Dec. 20, 2013) (distinguishing between group health insurers, which have an independent obligation under the regulations to provide contraceptive coverage, and third-party administrators, which do not). Yet we are judges, not moral philosophers or theologians; this is not a question of legal causation but of religious faith. Notre Dame tells us that Catholic doctrine prohibits the action that the government requires it to take. So long as that belief is sincerely held, I believe we should defer to Notre Dame's understanding.[2]

---

[2] The intervenors insinuate that sincerity is at issue, hinting at the possibility of last-minute influence by a group called the Sycamore Trust. While the district court may find a warrant for this suggestion once dis-

The district court relied in part on *Bowen v. Roy*, 476 U.S. 693 (1986), and derivatively *Kaemmerling v. Lappin*, 553 F.3d 669 (D.C. Cir. 2008), which the court thought foreclosed Notre Dame's objection to a mere "administrative tool, used to relieve Notre Dame of liability for not providing contraceptive payments." I do not read *Roy* as cutting so broadly. In fact, five justices in that case expressed the view that the plaintiffs "*were entitled* to an exemption" from an analogous "administrative" requirement—"that welfare recipients provide a social security number on their application." Michael W. McConnell, *Free Exercise Revisionism and the* Smith *Decision*, 57 U. Chi. L. Rev. 1109, 1127 (1990) (emphasis added).

*Roy* involved a Free Exercise Clause challenge to federal regulations governing state-run food-stamp programs. The plaintiff Roy, a member of the Abenaki tribe, had sought benefits for his two-year-old daughter. Roy objected to two distinct aspects of the regulations. First, he objected to a requirement that each applicant furnish a social security number on the application. Second, he challenged a requirement that states utilize social security numbers in administering the program (principally to prevent abuse or waste). *See* 476 U.S. at 699. Roy refused to furnish his daughter's number because he feared its use would "rob" her spirit and diminish her spiritual purity. *Id.* at 696. During the litigation, it became clear that the government had somehow obtained a social security number for Roy's daughter independently. *Id.* at 697. The government argued that the case had become moot, but Roy disagreed. *Id.*

---

covery proceeds, so far as I can determine, there is currently no basis in the record for concluding that Notre Dame has been insincere in advancing this litigation.

As the district court in this case correctly noted, the Court squarely rejected Roy's free exercise challenge to the state's *use* of the social security number, concluding that the First Amendment does not "require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens." 476 U.S. at 699. But a majority of justices indicated that the requirement that applicants *furnish* a social security number was a different matter. Five justices either concluded or strongly suggested that the government could not require an applicant to provide the number on a benefits application if the applicant had a sincere religious objection to doing so.

Justice O'Connor, joined by Justices Brennan and Marshall, determined that the requirement burdened Roy's exercise of religion, and that the government had "failed to show that granting a religious exemption to those who legitimately object to providing a Social Security number will do any harm to its compelling interest." 476 U.S. at 732 (O'Connor, J., concurring in part and dissenting in part). Justice White agreed; he would have enjoined both the provision and use requirements. *Id.* at 733 (White, J., dissenting). Finally, Justice Blackmun would have remanded the case to determine whether the issue was moot. However, he stated that if the issue were squarely presented, he would have agreed with Justice O'Connor and held that the government could not deny assistance based on a parent's religious refusal to provide a social security number. *Id.* at 714–16 (Blackmun, J., concurring in part).

To be sure, because only four justices actually reached the question, this conclusion does not constitute part of *Roy*'s

holding. Nevertheless, it provides a useful framework for analyzing the facts of this case.[3]

Under *Roy*'s approach, it is clear that RFRA does not authorize religious organizations to dictate the independent actions of third-parties, even if the organization sincerely disagrees with them. *See* 476 U.S. at 700 (noting that Roy could "no more prevail on his religious objection to the Government's use of a Social Security number for his daughter than he could on a sincere religious objection to the size or color of the Government's filing cabinets"). That is true whether the third-party is the government, an insurer, a student, or some other actor. *Cf. Korte*, 735 F.3d at 684 ("[I]t goes without saying that [the plaintiffs] may neither inquire about nor interfere with the private choices of their employees on these subjects."); *Roman Catholic Archdiocese of N.Y. v. Sebelius*, No. 12-2542, 2013 WL 6579764, at *13 (E.D.N.Y. Dec. 16, 2013) ("[I]t seems unlikely that placing new legal obligations on the third-parties with whom plaintiffs contract could be a substantial burden on *plaintiffs'* religion."). So long as the government does not require the university itself to take action, RFRA does not give Notre Dame a right to prevent the government from providing contraceptives to its students and employees. Indeed, at oral argument, counsel for Notre Dame acknowledged that the university would have no objection if the students or employees had to opt in to receive contraceptive coverage from insurers.

---

[3] Although *Roy* is a Free Exercise Clause case, not a RFRA case, "Congress was clear that RFRA codifies pre-*Smith* free-exercise jurisprudence." *Korte*, 735 F.3d at 679 (referring to *Employment Division v. Smith*, 494 U.S. 872 (1990)).

But the self-certification requirement is different. It is one thing for the government to take independent action. It is quite another for the government to "force[]" the university "to cooperate actively with the Government by themselves providing" the EBSA Form 700—a form that, in Notre Dame's view, endorses the provision of contraceptives to its students and employees. *Roy*, 476 U.S. at 714 (Blackmun, J., concurring in part). That type of compulsion takes this case out of the realm of independent action and into the sort of "direct, primary, and fundamental" pressure that renders "religious exercise … effectively impracticable." *Civil Liberties for Urban Believers*, 342 F.3d at 761.

The Supreme Court's recent decision to grant a temporary injunction in a similar RFRA challenge suggests to me that a majority of justices may continue to hold this view of free exercise rights (although now as a statutory matter, and not a constitutional one). *See Little Sisters of the Poor v. Sebelius*, No. 13-cv-2611, 2013 WL 6839900 (D. Colo. Dec. 27, 2013), *injunction pending appeal granted*, No. 13A691, 2014 WL 272207 (U.S. Jan. 24, 2014). Notably, the burden on the plaintiffs in *Little Sisters* appears less significant than the one on Notre Dame. The government tells us that Little Sisters provides group health insurance through a self-insured "church plan" that, because of a peculiar twist in ERISA, is itself exempt from the requirement to assume responsibility for contraceptive coverage. Under the current regime, the form that Little Sisters refuses to sign is entirely unconnected to the actual provision of contraceptive services, yet the Supreme Court still granted the requested injunction. Should the mandate be enforced in this case, by contrast, Notre Dame will continue to self-certify as part of a scheme that will actually deliver products and services to which the university

has a religious objection. I am well aware that the order in *Little Sisters* "should not be construed as an expression of the Court's views on the merits." 2014 WL 272207, at *1. However, I believe the Court's action strengthens the case for a preliminary injunction here, where the burden is, if anything, more concrete.

Now that Notre Dame has signed the self-certification form, the majority doubts whether we could grant the university any form of meaningful relief. I agree that we cannot enjoin the university's insurers from providing contraceptive coverage or require the government to forbid the insurers from doing so. However, this only underscores the point that Notre Dame does not (and cannot) take issue with the independent actions of third-parties. Meaningful relief follows from what Notre Dame *does* object to: a regulation that requires it either to pay for contraceptive services or self-certify that it has a religious objection in order to avoid substantial fines. I would therefore enjoin the government from enforcing the penalty against Notre Dame for not providing contraceptive coverage—even if Notre Dame revokes or fails to maintain its EBSA Form 700, refuses to make the form available for examination upon request, or takes any action otherwise inconsistent with 26 C.F.R. § 54.9815-2713A.

## III.

My conclusion is not intended to disparage the government's efforts at accommodation in this difficult area. Especially after *Employment Division v. Smith*, 494 U.S. 872 (1990), how best to accommodate the twin demands of religious faith and secular policy has become a challenging political problem as much as a legal one. Our interpretation of RFRA can only go so far in solving it. *Cf. Lyng v. Nw. Indian Ceme-*

*tery Protective Ass'n*, 485 U.S. 439, 452 (1988) ("[L]egislatures and other institutions," not courts, must "reconcile the various competing demands on government, many of them rooted in sincere religious belief, that inevitably arise in so diverse a society as ours."). Whatever the eventual outcome of this litigation, it would be unfortunate if it dissuaded either the government or religious institutions from taking further steps toward mutually acceptable accommodation.

*       *       *

Because dismissal of this appeal is no longer an option, I conclude that Notre Dame has shown a likelihood of success on the merits, and that it has met the other requirements for a preliminary injunction. I would therefore reverse the district court's order denying relief. I respectfully dissent.