# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Filed: May 20, 2015

No. 13-5368

PRIESTS FOR LIFE, ET AL.,
APPELLANTS

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN
SERVICES, ET AL.,
APPELLEES

———

Consolidated with 13-5371, 14-5021

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:13-cv-01261)
(No. 1:13-cv-01441)

———

On Petition for Rehearing En Banc

———

BEFORE: GARLAND, *Chief Judge*; HENDERSON, ROGERS,
TATEL, BROWN**,GRIFFITH, KAVANAUGH**, SRINIVASAN*,
MILLETT*, PILLARD, AND WILKINS, *Circuit Judges*.

## **O R D E R**

Appellants/cross-appellees' joint petition for rehearing en banc and the response thereto were circulated to the full court, and a vote was requested. Thereafter, a majority of the judges eligible to participate did not vote in favor of the petition. Upon consideration of the foregoing, it is

**ORDERED** that the petition be denied.

### **Per Curiam**

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:        /s/

Deputy Clerk

\* Circuit Judges Srinivasan and Millett did not participate in this matter.

\*\* Circuit Judges Brown and Kavanaugh would grant the petition.

A statement by Circuit Judge Pillard, joined by Circuit Judges Rogers and Wilkins, concurring in the denial of rehearing en banc, is attached.

A statement by Circuit Judge Brown, joined by Circuit Judge Henderson, dissenting from the denial of rehearing en banc, is attached.

A statement by Circuit Judge Kavanaugh, dissenting from the denial of rehearing en banc, is attached.

PILLARD, *Circuit Judge*, joined by ROGERS and WILKINS, *Circuit Judges*, concurring in the denial of rehearing en banc: A majority of the court has voted to deny the petition for rehearing en banc in this case. In two thoughtful opinions, Judge Kavanaugh, and Judge Brown joined by Judge Henderson, dissent from that denial. The panel's opinion speaks at length to the issues they take up. The panel members write further only to underscore why our court's approach accords with the Supreme Court's decision in *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014).

The dissenters and we agree that the Religious Freedom Restoration Act provides robust protection for religious liberty—without regard to whether others might view an adherent's beliefs or practices as irrational, trivial, or wrong. Nothing in our opinion should be seen to detract from that vital guarantee. Where we part ways is that the dissenters perceive in *Hobby Lobby* a potentially sweeping, new RFRA prerogative for religious adherents to make substantial-burden claims based on sincere but erroneous assertions about how federal law works. They believe we ignored that prerogative here. The dissenters read more into the Supreme Court's decision than it supports. *Hobby Lobby* embraced adherents' claim about the religious meaning of the undisputed operation of a federal regulation; this case involves a claim that courts must credit religious adherents' incorrect assertions about how a different federal regulation operates. Because *Hobby Lobby* did not address that distinct issue, we see no conflict.

The Court in *Hobby Lobby* invalidated the requirement that closely-held, for-profit businesses with religious objections to contraception nonetheless must buy health-insurance coverage for their employees that pays for contraception, or else face taxes or penalties. 134 S. Ct. at 2759. No opt out was available to those businesses. The parties in *Hobby Lobby* did not dispute what the law required, nor its practical effects: All agreed that the Affordable Care

Act regulations mandated that employer-sponsored health plans include contraception, and that as a result plaintiffs' employees got access to contraception paid for, in part, by their employers. *See id.* at 2762. What the parties in *Hobby Lobby* contested were the moral and religious implications of the businesses' conceded role. The plaintiff business owners believed that "providing the coverage demanded . . . is connected to the destruction of an embryo in a way that is sufficient to make it immoral for them to provide the coverage." *Id.* at 2778. The government disagreed, contending that employees' intervening choices whether to use contraception broke the chain of moral culpability, and hence the law did not substantially burden the businesses' religious exercise. *Id*. at 2777-78.

In rejecting the government's position in *Hobby Lobby*, the Supreme Court emphasized that courts may not second-guess religious beliefs about the wrongfulness of facilitating another person's immoral act. *Id.* at 2778. RFRA forbids courts from "provid[ing] a binding national answer to . . . religious and philosophical question[s]" or "tell[ing] the plaintiffs that their beliefs are flawed." *Id.*; *see also id.* at 2779 ("[I]t is not for us to say that [plaintiffs'] religious beliefs are mistaken or insubstantial. Instead, our 'narrow function in this context is to determine' whether the line drawn reflects 'an honest conviction.'" (alteration marks omitted) (quoting *Thomas v. Review Bd.*, 450 U.S. 707, 716 (1981))). The context makes clear that the Court's discussion of facilitation simply restates the basic tenet of the religious freedom cases that judges may not question the correctness of a plaintiff's religious beliefs.

That reasoning is inapplicable here. The dispute between the government and the Plaintiffs in this case, unlike in *Hobby Lobby*, is not about religious implications of acknowledged—

but perhaps attenuated—support for contraceptive use; the parties disagree here about how the law functions, and therefore whether there is any causal connection at all between employers' opt-out notice and employees' access to contraception. Plaintiffs challenge the accommodation, not available in *Hobby Lobby*, based on their assertion that what causes their employees to receive contraceptive coverage is their compliance with the accommodation's precondition that they give notice of their sincere religious objections to such coverage. As Plaintiffs characterize it, their act of excusing themselves from legal liability for not providing contraceptive coverage is what made such coverage available to employees, and hence violated their Catholic faith.

We held that Plaintiffs miscast the accommodation. The regulation allows Plaintiffs to continue to do just what they did before the ACA: notify their insurers of their sincere religious objection to contraception, and arrange for contraception to be excluded from the health insurance coverage they provide.[1] As before, insurers may sell plans

---

[1] Judge Kavanaugh is perplexed as to why, if not for an impermissible reason, the government requires any form at all. Kavanaugh Dissent at 12-13 & n.5. The form is far from "meaningless," *id*., because it acts as "the written equivalent of raising a hand in response to the government's query as to which religious organizations want to opt out," and extricates those objectors in a manner consistent with the contraceptive coverage requirement. *Priests for Life v. U.S. Dep't of Health & Human Servs.*, 772 F.3d 229, 250 (D.C. Cir. 2014). Only once an insurer becomes aware of the employer's religious objection can it take the steps needed to effectuate the opt out, such as: exclude contraceptive coverage from the employer's group health plan, prevent the employer's payment from funding contraception, notify the beneficiaries that the employer plays no role in administering or

that exclude contraception to their religious-nonprofit customers. The difference is that now the ACA and its regulations require that contraceptive coverage be provided to all insured women. In the case of women who get their insurance coverage through an accommodated employer, the law requires insurers to offer the women contraception under a separate plan—completely segregated from the objecting employer's plan and its payments.

The judges who urge us to rehear the case say that *Hobby Lobby* leaves no room for us to question Plaintiffs' characterization of how the challenged regulations operate, including their assertions that the regulations force Plaintiffs to facilitate the provision of contraception. As they read it, *Hobby Lobby* forbids a court deciding a claim under RFRA to assess whether a plaintiff's belief about what a law requires him to do is correct. *See, e.g.*, Kavanaugh Dissent at 8-11; Brown Dissent at 10-12. Both dissents argue that *Hobby Lobby*'s discussion of facilitation requires us simply to accept

---

funding contraceptive coverage, and arrange for separate mailings and accounting. *Id.* (citing regulatory provisions). Judge Kavanaugh would hold that including the insurer's identity in the form is unnecessarily restrictive of religious exercise because, extending our metaphor, he says it requires the objecting employer "both to raise its hand *and* to point to its insurer." Kavanaugh Dissent at 24 n.11. But it is more apt to say that, if the employer opts to raise its hand where the insurer cannot see it (*i.e.* via the alternative notice delivered to the government rather than the insurer, *see* 45 C.F.R. § 147.131(c)(1); 29 C.F.R. § 2590.715-2713A(b)(1)(ii)), the government must be in a position promptly to communicate the religious objection to the insurer, or else the employer's insurance plan will continue to include contraceptive coverage. An insurer that is kept in the dark about an employer's religious objections cannot do what it must to honor the opt out.

whatever beliefs a RFRA plaintiff avows—even erroneous beliefs about what a challenged regulation actually requires.

Neither the holding nor the reasoning of *Hobby Lobby* made that leap. RFRA understandably accorded Hobby Lobby Stores a victory in a contest over what *religious meaning* to ascribe to the Stores' payment for contraceptive coverage. That holding does not require us to credit Priests for Life's legally inaccurate assertions about the *operation of the regulation* they challenge. *See Univ. of Notre Dame v. Burwell*, No. 13-3853, slip op. at 11, 15 (7th Cir. May 19, 2015); *see also id.* at 34 (Hamilton, J., concurring). *But see id.* at 44-46 (Flaum, J., dissenting). Our panel opinion explains that it is the mandate on insurers that causes Plaintiffs' employees to receive contraceptive coverage, and not anything Plaintiffs are required to do in claiming their accommodation. The panel thus held that Plaintiffs suffered no substantial burden triggering RFRA strict scrutiny.

The dispute we resolved is legal, not religious. Under the ACA regulations, a woman who obtains health insurance coverage through her employer is no more entitled to contraceptive coverage if her employer submits the disputed notice than if it does not. The ACA obligation to provide contraceptive coverage to all insured women does not depend on that notice. Nothing in RFRA requires that we accept Plaintiffs' assertions to the contrary.

RFRA protects religious exercise. In no respect do we, nor could we, question Plaintiffs' sincere beliefs about what their faith permits and forbids of them. But we can and must decide which party is right about how the law works. We concluded that the regulation challenged in this case does not, as a matter of law or fact, give Plaintiffs' conduct the contraception-facilitating effect of which they complain.

Indeed, it bears emphasis that the whole point of the challenged regulation is to scrupulously shield objecting religious nonprofits from any role in making contraception available to women. The accommodation is itself evidence of the fundamental commitment of this Nation to religious freedom that RFRA embodies.  The regulation is, of course, properly subject to judicial scrutiny to verify that it comports with governing law, including *Hobby Lobby*.  Because we conclude that it does, we believe that en banc review is not warranted in this case.

BROWN, *Circuit Judge*, with whom HENDERSON, *Circuit Judge*, joins, dissenting from the denial of rehearing en banc: The French say: *plus ça change et plus c'est la même chose. The more things change; the more they remain the same.* There was once a time when the church was the state and the church as the state embodied all hope of human well-being. R.W. SOUTHERN, WESTERN SOCIETY AND THE CHURCH IN THE MIDDLE AGES 23 (1970). To challenge the church was to undermine civilization. Thus, the imposition of orthodoxy was deemed necessary, and dissent, which amounted to heresy, was met with coercion and violence. *See* ST. THOMAS AQUINAS, SUMMA THEOLOGIÆ pt. II-II, q. 11, art. 3.

This history prompted John Locke to urge toleration and stress the necessity of distinguishing "the business of civil government from that of religion" and establishing clear boundaries between them. John Locke, *A Letter Concerning Toleration*, reprinted in 5 THE WORKS OF JOHN LOCKE 5, 9 (12th ed. 1824). The Framers went further, establishing not only a limited government, but recognizing the primacy of individual conscience and seeking the line between freedom and justice. Thus, the Bill of Rights "grew in soil which also produced a philosophy that . . . liberty was attainable through mere absence of governmental restraints, and that government should be entrusted with few controls and only the mildest supervision over men's affairs." *W. Va. State Bd. of Educ. v. Barnette,* 319 U.S. 624, 639–40 (1943). The federal government was given no authority over men's souls. For the Founders, the not-so-distant history of persecution engendered a fierce commitment to each individual's natural and inalienable right to believe according to his "conviction and conscience" and to exercise his religion "as these may dictate." James Madison, *Memorial and Remonstrance Against Religious Assessments*, reprinted in 2 WRITINGS OF JAMES MADISON 183, 184 (G. Hunt ed. 1901). "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in

politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Barnette*, 319 U.S. at 642.

Of course, the right to freely exercise one's religion is not—and was not intended to be—absolute. The Founders recognized state coercion would at times be necessary, with Madison himself stating "full and free exercise . . . according to the dictates of conscience" could be limited where "the preservation of equal liberty . . . and the existence of the [government] may be manifestly endangered." G. Hunt, *Madison and Religious Liberty*, 1 ANNUAL REPORT OF THE AMERICAN HISTORICAL ASSOCIATION, H.R. Doc. No. 702, 57th Cong., 1st Sess., 163, 166–67 (1901). However, "[t]he essence of all that has been said and written on the subject is that only those interests of the highest order . . . can overbalance legitimate claims to the free exercise of religion." *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972).

The soil of the eighteenth century has eroded and that fixed star grown surprisingly dim. We live in a time where progress is sought "through expanded and strengthened governmental controls." *Barnette*, 319 U.S. at 640. In a sense the government now fills the role formerly occupied by the church, embodying the hope of human well-being. For the government to pursue the good and to solve society's problems, it must first identify that which is good and that which is problematic through subjective and value-laden judgments. *Cf.* Laurence H. Tribe, *Disentangling Symmetries*: *Speech, Association, Parenthood*, 28 PEPP. L. REV. 641, 651–53 (2001) (stating that when the government takes a side in a "direct clash of competing images of 'the good life,'" it "is making an intrinsically contestable statement about the rightness or wrongness" of ideals). Consequently, orthodoxy has been rehabilitated, and dissent

from the government's determinations may be quelled through coercion—onerous fines or banishment from commerce and the public square.

Despite the parallels, we do not find ourselves full circle quite yet. Religious adherents may still seek refuge from unnecessary governmental coercion through the Religious Freedom Restoration Act ("RFRA"). When the federal government substantially burdens free exercise, it may do so only in pursuit of a compelling interest and even then must use the least restrictive means. 42 U.S.C. § 2000bb-1. Further, the conscience of the individual remains protected in that he must "answer to no man for the verity of his religious views." *United States v. Ballard*, 322 U.S. 78, 87 (1944). But, in our respectful view, the panel in this case failed to apply these protections. The panel conceded Plaintiffs sincerely "believe that the regulatory framework makes them complicit in the provision of contraception," Slip Op. at 27 (quoting *Mich. Catholic Conf. v. Burwell*, 755 F.3d 372, 385 (6th Cir. 2014), *vacated and remanded*, No. 14-701, 2015 WL 1879768, at *1 (U.S. Apr. 27, 2015)). That acknowledgement should end our inquiry into the substance of their beliefs. Viewed objectively, Plaintiffs' belief that the acts the regulations compel them to perform would facilitate access to contraception in a manner that violates the teachings of their Church may "seem incredible, if not preposterous," to some people. *Ballard*, 322 U.S. at 87. However, this Court is neither qualified nor authorized to so scrutinize any religious belief. The panel trespassed into an area of inquiry Supreme Court precedent forecloses. It then proceeded to accept evidence that is insufficient under the rulings of the Supreme Court to find the purported compelling interest. For these reasons we believe this exceptionally important case is worthy of en banc review.

4

I

We begin by addressing the panel's opening observations and by making some of our own with the hopes of distinguishing between fact and fancy. First, this case is not about denying any woman access to contraception. A woman's right to obtain and use contraception was recognized long ago, and nothing about this case calls for the issue to be revisited. *See Griswold v. Connecticut*, 381 U.S. 479 (1965).

Second, this case is about the religious freedom of these religiously-affiliated organizations and not about the free exercise concerns of the plaintiffs in *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014). In that case, the Supreme Court found the Department of Health and Human Services' ("HHS") approach to religious nonprofits demonstrated there were less restrictive means available to deal with conscientious objectors among for-profit corporations. *Id.* at 2781–82. The Court expressly reserved judgment on whether HHS's approach "complies with RFRA for purposes of all religious claims." *Id*. at 2782. While the government's approach to religious non-profits may—or may not—fully put to rest the *Hobby Lobby* plaintiffs' religious objections, that is irrelevant to our consideration of the religious objections put forth by Plaintiffs in this case. The present Plaintiffs are entitled to their own personal beliefs.

Third, this case is not "paradoxical" because Plaintiffs object to regulatory requirements the government intended as a religious accommodation. Slip Op. at 24 (quoting *Univ. of Notre Dame v. Sebelius*, 743 F.3d 547, 557 (7th Cir. 2014), *vacated and remanded*, 135 S. Ct. 1528 (2015)). That the government's expressed intent in enacting the regulations at issue was to allay religious adherents' concerns about the contraception mandate is not determinative of the ultimate

5

question of whether Plaintiffs were in fact accommodated. Where the government imposes a substantial burden on religious exercise and labels it an "accommodation," that burden is surely as distressing to adherents as it would be if imposed without such a designation. Therefore, heightened skepticism is not appropriate. We should look at Plaintiffs' claims as we would any RFRA claim. After all, in the substantial burden analysis, the government's motivations—no matter how benevolent—are irrelevant; we ask only whether the government's action operates to place "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981).

Fourth, this case is not one in which Plaintiffs' "only harm . . . is that they sincerely feel aggrieved by their inability to prevent what other people would do to fulfill regulatory objectives after they opt out." Slip Op. at 24. The regulations compel Plaintiffs to take actions they believe would amount to "impermissibly facilitating access to abortion-inducing products, contraceptives, and sterilization" in violation of their religious tenets. Pet. for Reh'g En Banc at 1. Make no mistake: the harm Plaintiffs complain of—and the harm this Court therefore is called to assess—is from their inability to conform *their own* actions and inactions to their religious beliefs without facing massive penalties from the government.

II

The panel's substantial burden analysis is inconsistent with the precedent of the Supreme Court and this Court, which identifies both permissible and impermissible lines of inquiry in the substantial burden analysis of a RFRA claim.

6

A

As we have recognized, whether a burden is "substantial" for purposes of RFRA is a question of law for the court to answer, not a "question[] of fact, proven by the credibility of the claimant." *Mahoney v. Doe*, 642 F.3d 1112, 1121 (D.C. Cir. 2011). Relying on longstanding precedent, the Supreme Court recently described permissible lines of inquiry for a court to pursue in determining whether an adherent's religious exercise has been substantially burdened, both in *Hobby Lobby* and in *Holt v. Hobbs*, 135 S. Ct. 853 (2015), a case involving the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §2000cc et seq, (RLUIPA).[1] The plaintiff bears 'the initial burden of proving [the law or regulation at issue] implicates his religious exercise." *Holt*, 135 S. Ct. at 862. While RFRA forecloses asking whether the exercise is "compelled by, or central to, a system of religious belief," 42 U.S.C. § 2000cc-5(7)(A), the court does ask whether the plaintiff's beliefs are sincere. The answer is no if his claims are not "sincerely based on a religious belief" but instead on "some other motivation." *Holt*, 135 S. Ct. at 862; *see also Hobby Lobby*, 134 S. Ct. at 2774 n.28 ("To qualify for RFRA's protection, an asserted belief must be 'sincere.'").

Next, the plaintiff bears the "burden of proving that the [law or regulation] substantially burden[s] that exercise of religion." *Holt*, 135 S. Ct. at 862. The court asks whether he has been "put[] to th[e] choice" of either "'engag[ing] in conduct that seriously violates [his] religious beliefs" or

[1] RLUIPA "targets two areas of state and local action: land use regulation, 42 U.S.C. § 2000cc (RLUIPA § 2), and restrictions on the religious exercise of institutionalized persons, § 2000cc–1 (RLUIPA § 3)." *Sossamon v. Texas*, 131 S. Ct. 1651, 1656 (2011). It "borrows important elements from RFRA . . . but is less sweeping in scope." *Id.*

facing "serious" consequences. *Id*. (quoting *Hobby Lobby*, 134 S. Ct. at 2775); *see also Thomas*, 450 U.S. at 718 (stating a substantial burden exists when the government places "substantial pressure on an adherent to modify his behavior and to violate his beliefs"). The answer is no if the plaintiff can identify "no [compelled] action or forbearance on his part." *Kaemmerling*, 553 F.3d at 679 (plaintiff objecting to the government's extraction of DNA information from fluid or tissue samples but not to providing DNA samples); *see also Bowen v. Roy*, 476 U.S. 693, 699–700 (1986) (plaintiff objecting to the government's independent utilization of his daughter's social security number, which he himself was not required to provide or use). The answer is also no where the pressure being placed upon a person to act contrary to his beliefs or the consequences he faces for not doing so are not substantial. *See Thoma*s, 450 U.S. at 717 (assessing the "coercive impact" of being "put to a choice between fidelity to religious belief or cessation of work"). Finally, this Court has "inquir[ed] into the importance of a religious practice" to the individual. *Henderson v. Kennedy*, 265 F.3d 1072, 1074 (D.C. Cir. 2001) (denying rehearing en banc). In doing so, we have found no substantial burden exists where a regulation is "at most a restriction on one of a multitude of means" for an individual to engage in his desired religious exercise. *Henderson v. Kennedy*, 253 F.3d 12, 17 (D.C. Cir. 2001) (the plaintiffs could spread the gospel any number of ways, just not the prohibited means of selling t-shirts on the National Mall); *see also Mahoney*, 642 F.3d at 1120–21 (the plaintiff had ample alternative means of spreading his religious message besides chalking the sidewalk in front of the White House).[2]

---

[2] While the propriety of this sort of inquiry in pure free exercise cases is arguably called into question by recent Supreme Court

8

Here, Plaintiffs' faith compels them to provide their employees and students with health insurance plans. Oral Arg. Tr. at 19:5–15. Their religious beliefs forbid them not only from providing or paying for contraception, but also from facilitating its provision. Pls. Br. at 15. Plaintiffs therefore believe they exercise their religion by providing health insurance plans that do not facilitate access to contraception. *Id.* at 11-12, 15, 24–25. In determining whether an act constitutes impermissible facilitation Plaintiffs are informed by "the Catholic doctrines of material cooperation and scandal." *Id.* at 36. The sincerity of Plaintiffs' beliefs has not been questioned. Slip Op. at 26.

Plaintiffs identify at least two acts that the regulations compel them to perform that they believe would violate their religious obligations: (1) "hiring or maintaining a contractual relationship with any company required, authorized, or incentivized to provide contraceptive coverage to beneficiaries enrolled in Plaintiffs' health plans," Pet. for Reh'g En Banc at 3; and (2) "filing the self-certification or notification," *id.* at 4. Plaintiffs have therefore shown both that they are being compelled to modify their behavior and that, if undertaken, the modification would be a violation of their religious beliefs. They are unlike the plaintiffs in *Kaemmerling* and *Bowen*, as they have shown they are themselves being compelled to modify their behavior.

If Plaintiffs do not act in violation of their beliefs, however, they face two alternatives. First, they may offer coverage that does not include contraceptives and face onerous fines. 26 U.S.C. § 4980D(b)(1). Alternatively, they

precedent, *see Holt*, 135 S. Ct. at 862, it is not relevant to this case. That the practice Plaintiffs defend here is of sufficient importance to them to form the basis of a substantial burden under RFRA has not been questioned.

may stop providing health insurance altogether, which would also be a violation of their religious beliefs. Oral Arg. Tr. at 19:5–15. Imposing such harsh consequences certainly substantially pressures Plaintiffs to alter their behavior in a way inconsistent with their religious beliefs. *See Hobby Lobby*, 134 S. Ct. at 2759 (stating if "heavy" financial penalties "do not amount to a substantial burden, it is hard to see what would"). Plaintiffs have therefore demonstrated their free exercise is substantially burdened: they are being "put[] to [the] choice" of either "'engag[ing] in conduct that seriously violates [their sincere] religious beliefs'" or facing "serious" consequences. *Holt*, 135 S. Ct. at 862 (quoting *Hobby Lobby*, 134 S. Ct. at 2775).

## B

The panel's opinion parts ways with precedent by wading into impermissible lines of inquiry. The panel did not dispute that federal law operates to compel Plaintiffs to maintain a relationship with an issuer or TPA that will provide the contraceptive coverage and to execute the self-certification or alternative notice. Their disagreement with Plaintiffs is about the *significance* of those compelled acts; in other words, the panel rejected the "adherents' claim about the religious meaning of the undisputed operation of [] federal regulation[s]." Concurring Op. at 1; *see also Eternal Word Television Network, Inc. v. Sec'y, Dep't of Health & Human Servs.*, 756 F.3d 1339, 1340 (11th Cir. 2014) (Pryor, J. specially concurring) (disposing of the argument that the plaintiff's complaint should "fail[] because [the plaintiff] holds an erroneous legal opinion about how the contraception mandate works" because the plaintiff "offer[ed] no evidence that its complaint turns on the advice of counsel" but instead offered "undisputed declarations . . . about the ancient teachings of the Catholic Church"). With a thorough analysis

of the regulations, the panel determined they "do not compel" Plaintiffs to "provide, pay for, and/or facilitate access to contraception, sterilization, abortion, or related counseling in a manner that violates the teachings of the Catholic Church." Slip Op. at 26 (quoting Pls.' Br. at 15). The panel explained the regulations allow Plaintiffs to "wash[] their hands of any involvement in providing insurance coverage for contraceptive services." *Id.* Therefore, the panel concluded, Plaintiffs have been subjected to only to a *de minimis* burden of completing a form, and their RFRA claim fails. *Id.* at 31.

In declaring that—contrary to Catholic Plaintiffs' contentions—it would be consistent with the teaching of the Catholic Church for Plaintiffs to comply with the regulations the panel exceeded both the "judicial function and [the] judicial competence." *Thomas*, 450 U.S. at 716. What amounts to "facilitating immoral conduct," Pet. for Reh'g En Banc at 1, "scandal," *id.* at 7, and "material" or "impermissible cooperation with evil," *id.*; Slip Op. at 14, are inherently theological questions which objective legal analysis cannot resolve and which "federal courts have no business addressing." *Hobby Lobby,* 134 S. Ct. at 2778; *see also id.* (stating "the circumstances under which it is wrong for a person to perform an act that is innocent in itself but has the effect of enabling or facilitating the commission of an immoral act by another" is "a difficult and important question of religion and moral philosophy"). The causal connection sufficient to create impermissible "facilitation" in the eyes of a religious group may be very different from what constitutes proximate cause in the common law tradition. *See Univ. of Notre Dame*, 743 F.3d at 566 (Flaum, J., dissenting) ("[W]e are judges, not moral philosophers or theologians; this is not a question of legal causation but of religious faith."). Likewise, where civil authorities may conclude an individual has "wash[ed his] hands of any involvement," Slip Op. at 26,

adherents of a faith may examine the same situation and, in their religious judgment, reach the opposite conclusion. Pontius Pilate, too, washed his hands, but perhaps he perceived the stain of complicity remained. *See Matthew 27:24.*

Under the panel's analysis, it seems no claim of substantial burden may prevail where the religious significance of conduct under scripture as interpreted by a faith tradition differs from the legal significance of that conduct under the laws of the United States as interpreted by federal judges. But RFRA would be an exceedingly shallow—perhaps nonexistent—protection of religious exercise if adherents were only permitted to give the same meaning to their actions or inactions as does the secular law.

Plaintiffs, including an Archbishop and two Catholic institutions of higher learning, say compliance with the regulations would facilitate access to contraception in violation of the teachings of the Catholic Church. What law or precedent grants this Court authority to conduct an independent inquiry into the correctness of this belief? Instead, where one sincerely believes performing certain acts would cause him to cross the line between permissible behavior and sin, the Supreme Court has instructed, "it is not for us to say that the line he drew was an unreasonable one." *Hobby Lobby*, 134 S. Ct. at 2778 (quoting *Thomas*, 450 U.S. at 715). Plaintiffs' sincere determination about the obligations their religion imposes is between them and their God and need not be "acceptable, logical, consistent, or comprehensible to others in order to merit . . . protection." *Thomas*, 450 U.S. at 714. This is so even when, in the government's opinion, Plaintiffs' determination is based on a misunderstanding of the nature of their legal obligations, their religious obligations, or both—as the two could certainly

overlap.[3] RFRA's concern is with the *sincerity* of religious beliefs and not their *accuracy*. For example in *United States v. Lee*, Mr. Lee claimed he could not pay social security taxes without violating an obligation under his Amish faith to care for fellow church members. 455 U.S. 252, 257 (1982). The Supreme Court refused to consider the government's argument that paying social security taxes did not actually interfere with exercise of this belief, as the Amish would

---

[3] Confusion remains as to the legal obligations the regulations impose on third party administrators ("TPAs"). In *Wheaton College v. Burwell*, Justice Sotomayor explained a TPA does not have an independent obligation but instead "bears the legal obligation to provide contraceptive coverage only upon receipt of a valid self-certification." 134 S. Ct. 2806, 2814 n.6 (2014) (Sotomayor, J., dissenting) (citing 26 C.F.R. § 54.9815–2713A(b)(2) (2013); 29 C.F.R. § 2510.3–16(b) (2013)). Even evaluating the new regulations as supplemented in light of the Supreme Court's ruling in *Wheaton College*, the panel did not identify any scenario under which a TPA is obligated to provide contraceptive coverage until the TPA is designated a "plan administrator" for purposes of ERISA. Slip Op. 41–43. As the regulations currently stand, this designation occurs only after a religious nonprofit has either completed the self-certification form or the alternative notice and after the TPA agrees to enter into or remain in a contractual relationship with the nonprofit organization. *See* 26 C.F.R. § 54.9815-2713AT(b)(2) (2014) ("*If* a third party administrator *receives* a copy of the self-certification from an eligible organization or a notification from the Department of Labor [sent after the religious nonprofit provides notice of its objection to the Department] . . . *and agrees* to enter into or remain in a contractual relationship with the eligible organization . . . the third party administrator shall provide or arrange for payments of contraceptive services . . . .") (emphasis added). If the panel relied on a mistaken assumption about the regulations imposing an independent obligation on TPAs to provide contraceptive coverage, rehearing en banc is all the more warranted.

remain free to care for their own community if they paid social security taxes but did not collect benefits. *Id.* Instead the Court simply accepted Mr. Lee's "contention that both payment and receipt of social security benefits is forbidden by the Amish faith," explaining "[c]ourts are not arbiters of scriptural interpretation." *Id*. (quoting *Thomas*, 450 U.S. at 716).

The panel's analysis further parts ways with precedent by recasting Plaintiffs' objection to the facilitation of access as an objection to the conduct of third parties. Slip Op. at 34. The panel relied on *Bowen* and *Kaemmerling* to find Plaintiffs may not object "to the role of [their] action in the broader regulatory scheme." Slip Op. at 35. There are two problems with this analysis. First, in this case the government is requiring *Plaintiffs* to perform objectionable acts. In contrast, the *Bowen* and *Kaemmerling* plaintiffs' objections were to the *government's* actions. *See Bowen*, 476 U.S. at 699–700; *Kaemmerling*, 553 F.3d at 678. The claims in *Bowen* and *Kaemmerling* are different in kind from a claim that the government is compelling the individual *himself* to undertake actions he believes are sinful.

Second, the actions to which Plaintiffs object—which may seem innocent if examined devoid of context—must be understood in light of the broader regulatory scheme. When the Supreme Court has considered claims involving beliefs about facilitation of immoral conduct, it has not employed the panel's approach of requiring the adherent to view their own actions in isolation. Instead the Court found a substantial burden where the plaintiffs were compelled to take actions they believed to be impermissible based on the actions' place in a chain of events. *See, e.g.*, *Hobby Lobby*, 134 S. Ct. at 2759 (the plaintiffs objected to providing access to abortifacients because *others*' use of the drugs may result in

the destruction of a human embryo); *Thomas*, 450 U.S. at 710 (plaintiff objected to fabricating turrets because those turrets would then be affixed by *others* to military tanks and used by *others* in warfare). This makes good sense, as the concept of facilitation inherently involves a view of one's conduct in relation to that of others'. Logic and precedent therefore compel us to permit persons to object to performing an act that would be itself innocent but for its illicit consequences. Plaintiffs object to maintaining a relationship with an issuer or third-party administrator ("TPA") that will use Plaintiffs' health insurance plans as vehicles to provide contraceptive coverage. They object to completing, as the panel describes it, an "opt-out mechanism that shifts to third parties the obligation to provide contraceptive coverage." Slip Op. at 36. Such claims do not fall outside the purview of RFRA.

## III

As Plaintiffs have demonstrated a substantial burden on their free exercise, the government may only prevail by demonstrating the regulations further a compelling interest and employ the least restrictive means of doing so. 42 U.S.C. § 2000bb–1. A compelling interest is an interest "of the highest order." *Yoder*, 406 U.S. at 215. To satisfy strict scrutiny, the government must "specifically identify an actual problem in need of solving" and the burden on free exercise "must be actually necessary to the solution." *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2738 (2011) (internal citations and quotations omitted). The panel found the government demonstrated a compelling interest in "seamless provision of contraceptive services." Slip Op. at 49. The panel then rejected any less restrictive means of providing contraceptive coverage without cost sharing that would require women to complete additional steps to obtain the coverage, explaining such means "make the coverage no

longer seamless from the beneficiaries' perspective." *Id*. at 24.

Even assuming for the sake of argument that the government possesses a compelling interest in the provision of contraceptive coverage without cost sharing, it has not succeeded in demonstrating a compelling interest in the "seamless" provision of coverage. The government has pointed to no evidence in the record demonstrating its purported interest in providing contraceptive coverage without cost-sharing is harmed when women must undergo additional administrative steps to receive the coverage. The government cites only to one page in the Federal Register to support the proposition that coverage must be provided seamlessly.[4] Gov't Supp. Br. at 20 (citing 78 Fed. Reg. 39,870, 39,888 (Jul. 2, 2013)). This page provides no evidence that a procedure under which individuals must take additional steps to receive contraceptive coverage poses a "problem in need of solving," but instead offers only conclusory and unsubstantiated statements that surely cannot be sufficient for the government to meet its burden in strict scrutiny analysis. That "additional steps" would be so burdensome as to hinder women's access to contraception is pure speculation. For example, if all that was required was that the employee or student fills out a "simple, one-step form," that would be a "*de minimis* requirement" to which we assume the panel would have no objection. Slip Op. at 26, 31; *see also Roman Catholic Archdiocese of New York v.*

---

[4] The government also references pages of a 2011 Institute of Medicine Report entitled, "Clinical Preventative Services for Women: Closing the Gaps." Gov't Supp. Br. at 20 (citing pages 103–07). These pages of the report discuss benefits of contraceptive services and do not reference, much less weigh, the comparative advantage or disadvantage of procedures for accessing those services.

*Sebelius*, 987 F. Supp. 2d 232, 256 (E.D.N.Y. 2013) ("If these steps only entail filling out a form, it seems that the burden of filling out that form should fall on those who have no religious objection to doing so.").

Further, the government cannot meet its burden of demonstrating a compelling interest where it leaves "appreciable damage to [the] supposedly vital interest unprohibited." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993) (quoting *Fla. Star v. B.J.F.*, 491 U.S. 524, 542 (1989) (Scalia, J., concurring)); *see also Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002) (stating a law's purpose is undermined when it is "so woefully underinclusive as to render belief in [its] purpose a challenge to the credulous"). As the panel notes, the Affordable Care Act permits employers to "ceas[e] to offer health insurance as an employment benefit, and instead pay[] the shared responsibility assessment and leav[e] the employees to obtain subsidized health care coverage on an insurance exchange." Slip Op. at 23. While Plaintiffs state they cannot exercise this option without violating their religious obligations, Oral Arg. Tr. at 19:5–15, the panel nevertheless reminds them it would be acceptable under the law. Slip Op. at 23. The untold many whose employers provide no health insurance and instead pay the assessment must face "logistical, informational, and administrative burdens," *id.* at 63, in arranging for subsidized coverage on a health insurance exchange. They must "take steps to learn about, and to sign up for," 78 Fed. Reg. at 39,888, health insurance on their own. The government simply cannot argue with a straight face that women who gain access to contraceptive coverage by identifying and signing up for a subsidized health insurance plan on a government exchange receive that coverage "seamlessly." *Cf. Hobby Lobby*, 134 S. Ct. at 2783. Therefore, in leaving "appreciable damage" to its

"supposedly vital interest" in seamless provision of contraceptive coverage, the government's regulations cannot survive strict scrutiny. *Church of the Lukumi Babalu Aye*, 508 U.S. at 547 (quoting *Fla. Star*, 491 U.S. at 542 (Scalia, J., concurring)).

The question of least restrictive means then becomes the other side of the same coin. The government could treat employees whose employers do not provide complete coverage for religious reasons the same as it does employees whose employers provide no coverage. This would entail providing for subsidized—or in this case free—contraceptive coverage to be made available on health care exchanges. An employee of a religious objector then would face the same administrative burdens as those who find complete coverage—including contraceptive services coverage—on the exchanges. However, just like others who use the exchanges, after overcoming these administrative hurdles, employees of religious objectors would have contraceptive coverage without cost sharing. Such a mechanism would therefore be effective and would minimize the burden on religious adherents, demonstrating its viability as a less restrictive means than the current regulations.

IV

The Supreme Court has interpreted the First Amendment to deprive individuals of constitutional protection against neutral laws—meaning almost any law where the government does not announce its intention "to infringe upon or restrict practices because of their religious motivation." *Church of the Lukumi Babalu Aye,* 508 U.S. at 533. Genuine neutrality, however, would "allow[] many different and contending voices to be represented in public discourse." Michael W. McConnell, *Why is Religious Liberty the "First Freedom"?*,

21 CARDOZO L. REV. 1243, 1262 (2000). When the state quells disparate voices, declaring a winner on one side of the culture wars, neutrality becomes a proxy for majoritarianism and secularism. *Id.*

Priests for Life is an organization that exists solely for the purpose of countering the benign narrative that contraception and abortion are beneficial to women. The other Plaintiffs exist, at least in part, to engender a counter-cultural narrative that "life begins at the moment of conception . . . and that certain 'preventative' services that interfere with conception or terminate a pregnancy are immoral." Pls. Br. at 15. Those who accept employment with these organizations and students who enroll at these schools do so with full awareness of their mediating stance. Nevertheless, though the government acknowledges that a primary goal of such organizations is to oppose the government's mission of increasing access to and use of contraception, it places them outside its grudging religious exemption and offers only one real choice—they can renounce their religious scruples overtly or in practical effect. If the government coopts their contractors and administrative structures to dispense advice, drugs, and services that contravene their religious views, in effect, it has written contraceptive care, including access to abortifacients, into Plaintiffs' employment contracts and student health care agreements. Commandeering is not accommodation, and, in this context, "seamlessness" is just shorthand for surrender.

The French have another saying, mocking the Bourbon restoration: *ils n'ont rien appris, ni rien oublié. Learning nothing and forgetting nothing*. The modern maxim does the Bourbon monarchs one better: learning nothing and forgetting everything. Alas, preserving the fragile ark of our constitutionalism requires us to remember that the first

principle of liberty is freedom from gratuitous coercion. We respectfully dissent.

KAVANAUGH, *Circuit Judge*, dissenting from the denial of rehearing en banc: In my respectful view, the panel opinion misapplies the Religious Freedom Restoration Act and contradicts the Supreme Court's recent decisions in *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014), *Wheaton College v. Burwell*, 134 S. Ct. 2806 (2014), and *Little Sisters of the Poor Home for the Aged v. Sebelius*, 134 S. Ct. 1022 (2014). I would grant rehearing en banc and rule for the plaintiff religious organizations.

At the outset, it is important to recognize that two of the key Supreme Court precedents here – *Hobby Lobby* and *Wheaton College* – were divided decisions with vigorous dissents. Some believe that those two decisions tilted too far in the direction of religious freedom. Others, by contrast, think that those decisions did not go far enough in the direction of religious freedom. We are a lower court in a hierarchical judicial system headed by "one supreme Court." U.S. Const. art. III, § 1. It is not our job to re-litigate or trim or expand Supreme Court decisions. Our job is to follow them as closely and carefully and dispassionately as we can. Doing so here, in my respectful view, leads to the conclusion that the plaintiff religious organizations should ultimately prevail on their RFRA claim, but not to the full extent that they seek.

Some background: The Affordable Care Act requires most employers, including non-profit organizations, to provide health insurance coverage for their employees or else pay a significant monetary penalty to the Government. By regulation, that insurance must cover all FDA-approved contraceptives, including certain methods of birth control that, some believe, operate as abortifacients and result in the destruction of embryos.

As a religious accommodation, the regulations exempt religious non-profit organizations from the contraceptive

mandate. To be exempt from the monetary penalty, however, the religious organizations must either submit a form with certain required information to their insurer or submit a letter with certain required information to the Secretary of Health and Human Services.[1] (For ease of reference, I will use the term "form" to cover both documents.) The insurer must continue to provide contraceptive coverage to the religious organizations' employees, albeit with separate funds provided either by the insurer itself or by the United States.

Many prominent religious organizations around the country – including the plaintiffs in this case – have bitterly

---

[1] The form submitted to a religious organization's insurer must certify that the organization (1) opposes providing coverage for some or all of the contraceptive services required by the contraceptive mandate on account of religious objections; (2) is organized and operates as a non-profit entity; and (3) holds itself out as a religious organization. *See* 29 C.F.R. § 2590.715-2713A(a), (b)(1)(ii), (c)(1); 45 C.F.R. § 147.131(b), (c)(1). In certain circumstances, the form must also "include notice" of the insurer's obligations to provide contraceptive coverage to the religious organization's employees. 29 C.F.R. § 2590.715-2713A(b)(1)(ii)(A).

The letter to the Secretary of Health and Human Services must include the following information: (1) the name of the religious non-profit organization; (2) the basis on which it qualifies for an accommodation; (3) its objection based on sincerely held religious beliefs to providing coverage for some or all contraceptive services, including notice of the subset of contraceptive services to which it objects; (4) its insurance plan's name and type; and (5) the name and contact information for any of the insurance plan's third party administrators and health insurance issuers. *See* 29 C.F.R. § 2590.715-2713A(b)(1)(ii)(B), (c)(1)(ii); 45 C.F.R. § 147.131(c)(1)(ii); Coverage of Certain Preventative Services Under the Affordable Care Act, 79 Fed. Reg. 51,092, 51,094-95 (Aug. 27, 2014).

objected to this scheme. They complain that submitting the required form contravenes their religious beliefs because doing so, in their view, makes them complicit in providing coverage for contraceptives, including some that they believe operate as abortifacients. They say that the significant monetary penalty for failure to submit the form constitutes a substantial burden on their exercise of religion. They contend, moreover, that the Government has less restrictive ways of ensuring that the employees of the religious organizations have access to contraception without making the organizations complicit in the scheme in this way.

The plaintiffs in this case have sued under the Religious Freedom Restoration Act, known as RFRA. RFRA grants individuals and organizations an exemption from generally applicable federal laws that "substantially burden" their "exercise of religion," unless the Government demonstrates that the law furthers a "compelling governmental interest" and is the "least restrictive means" of furthering that interest. 42 U.S.C. § 2000bb-1.[2] As the Supreme Court has explained, "RFRA was designed to provide very broad protection for religious liberty." *Hobby Lobby*, 134 S. Ct. at 2767, slip op. at 17. RFRA statutorily incorporated the compelling interest test that the Supreme Court had applied in cases such as *Sherbert v. Verner*, 374 U.S. 398 (1963), and *Wisconsin v. Yoder*, 406 U.S. 205 (1972). 42 U.S.C. § 2000bb(b)(1).

Under RFRA and the relevant Supreme Court case law, we must consider three questions here. First, do the

---

[2] The relevant section of RFRA provides in full: "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b).

regulations – which compel religious organizations to submit the required form or else pay significant monetary penalties – "substantially burden" the religious organizations' "exercise of religion"? Second, if so, does the Government have a "compelling" interest in facilitating access to contraception for the employees of these religious organizations? Third, if the Government does have such a compelling interest, do the regulations represent the "least restrictive" means of furthering that interest?

I conclude as follows:

*First*, under *Hobby Lobby*, the regulations substantially burden the religious organizations' exercise of religion because the regulations require the organizations to take an action contrary to their sincere religious beliefs (submitting the form) or else pay significant monetary penalties.

*Second*, that said, *Hobby Lobby* strongly suggests that the Government has a compelling interest in facilitating access to contraception for the employees of these religious organizations.

*Third*, this case therefore comes down to the least restrictive means question. Under *Hobby Lobby*, *Wheaton College*, and *Little Sisters of the Poor*, requiring the religious organizations to submit this form is not the Government's least restrictive means of furthering its interest in facilitating access to contraception for the organizations' employees. Rather, the Government can achieve its interest even if it accepts the less restrictive notice that the Supreme Court has already relied on in the *Wheaton College* and *Little Sisters of the Poor* cases. Unlike the form required by current federal regulations, the *Wheaton College/Little Sisters of the Poor* notice does not require a religious organization to identify or

notify its insurer, and thus lessens the religious organization's complicity in what it considers to be wrongful. And even with just the *Wheaton College*/*Little Sisters of the Poor* notice, the Government can independently determine the identity of the organization's insurer and thereby ensure that the same insurer continues to provide the same contraceptive coverage to the organization's employees. Hence, the *Wheaton College*/*Little Sisters of the Poor* notice is a less restrictive way for the Government to achieve its compelling interest.

I

*First*, under *Hobby Lobby*, this regulatory scheme imposes a substantial burden on plaintiffs' exercise of religion.

Under RFRA, a substantial burden on the exercise of religion occurs when, for example, the Government imposes sanctions or punishment on someone, or denies a benefit to someone, for exercising his or her religion. Thus, if the Government requires someone (under threat of incurring monetary sanctions or punishment, or of having a benefit denied) to act or to refrain from acting in violation of his or her sincere religious beliefs, that constitutes a substantial burden on the exercise of religion. *See Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2775-79, slip op. at 31-38 (2014); *Thomas v. Review Board of Indiana Employment Security Division*, 450 U.S. 707, 717-18 (1981); *Sherbert v. Verner*, 374 U.S. 398, 403-04 (1963).

That is precisely what has happened here.

The "substantial burden" in this case comes from the large monetary penalty imposed on religious organizations

that choose not to submit the required form. *Cf. Hobby Lobby*, 134 S. Ct. at 2775-76, 2779, slip op. at 31-32, 38. It is settled that a direct monetary penalty on the exercise of religion constitutes a "substantial burden." *See id.* (penalty for not providing contraceptive coverage); *Wisconsin v. Yoder*, 406 U.S. 205, 208, 218-19 (1972) (fine for not sending children to high school); *Sherbert*, 374 U.S. at 404 (describing hypothetical fine for Saturday worship).[3]

Therefore, the remaining question with respect to the first prong of the RFRA analysis is whether submitting the form actually contravenes plaintiffs' sincere religious beliefs. In analyzing that question, we must first understand the context in which the question arises. In most religious liberty cases, the Government has said in essence: "Do X or suffer a penalty." The religious objector responds that X violates his

---

[3] The Supreme Court has determined that denying benefits to (and not just imposing penalties on) someone engaged in conduct mandated by religious belief imposes a substantial burden on the exercise of religion. In denial-of-benefits cases, "[w]hile the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial." *Thomas*, 450 U.S. at 718. Congress incorporated that broad understanding of substantial burden into RFRA. Of course, the question of indirect burdens from the denial of government benefits is not at issue in this case. Here, we have the classic direct monetary penalty compelling conduct that contravenes religious belief. There has never been a question that such a direct penalty imposes a substantial burden on the exercise of religion. *See Hobby Lobby*, 134 S. Ct. at 2775-76, 2779, slip op. at 31-32, 38; *Yoder*, 406 U.S. at 208, 218; *Sherbert*, 374 U.S. at 404. Put simply, it is black-letter law that a "substantial burden" on the exercise of religion occurs when, as here, the government "compel[s] someone to do something that violates his religious beliefs, or prohibit[s] someone from doing something that is mandated by his religious beliefs." Eugene Volokh, *The First Amendment and Related Statutes* 1060 (5th ed. 2014).

or her religious beliefs.  For example, in the recent *Holt v. Hobbs* case, it was "shave your beard or suffer a penalty."  *See Holt v. Hobbs*, 135 S. Ct. 853, 860-61, slip op. at 4 (2015).  Or in the classic *Wisconsin v. Yoder* case, it was "send your children to high school or pay a $5 fine."  *See* 406 U.S. at 208.  Or in *United States v. Lee*, it was "pay the Social Security tax or suffer a penalty."  *See* 455 U.S. 252, 254-55 (1982).  Simple enough.

Here, the situation is only slightly more complicated.  The Government has said in essence:  "Do X or Y or suffer a penalty."  X is provide contraceptive coverage.  Y is submit the form.  All agree that X – providing contraceptive coverage – implicates plaintiffs' "exercise of religion."  But religious organizations can avoid that option by choosing Y – submitting the form.  In other words, the Government is exempting religious organizations from providing contraceptive coverage but is still saying:  "Submit the form or suffer a penalty."

As a result, the key inquiry under the first prong of RFRA is whether submitting the form violates plaintiffs' sincere religious beliefs.  The form is part of the process by which the Government ensures that the religious organizations' insurers provide contraceptive coverage to the organizations' employees.  To plaintiffs, the act of "submitting" this form would, "in their religious judgment, impermissibly facilitate[] delivery" of contraceptive and abortifacient coverage.  Plaintiffs' Supplemental Br. 1.

As the Supreme Court stated in *Hobby Lobby*, such a question of complicity – that is, when "it is wrong for a person to perform an act that is innocent in itself but that has the effect of enabling or facilitating the commission of an immoral act by another" – is "a difficult and important

question of religion and moral philosophy." *Hobby Lobby*, 134 S. Ct. at 2778, slip op. at 36. Judge Gorsuch has explained well the complicity issue that arises in these circumstances: "All of us face the problem of complicity. All of us must answer for ourselves whether and to what degree we are willing to be involved in the wrongdoing of others. For some, religion provides an essential source of guidance both about what constitutes wrongful conduct and the degree to which those who assist others in committing wrongful conduct themselves bear moral culpability. [Plaintiffs] are among those who seek guidance from their faith on these questions. Understanding that is the key to understanding this case." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1152 (10th Cir. 2013) (Gorsuch, J., concurring).

But what if the religious organizations are misguided in thinking that this scheme – in which the form is part of the process by which the Government ensures contraceptive coverage – makes them complicit in facilitating contraception or abortion? That is not our call to make under the first prong of RFRA. The Supreme Court has emphasized that judges in RFRA cases may question only the sincerity of a plaintiff's religious belief, not the correctness or reasonableness of that religious belief. *See Hobby Lobby*, 134 S. Ct. at 2774 n.28, 2777-79, slip op. at 29 n.28, 35-38; *see also Thomas*, 450 U.S. at 714-16.[4] The Supreme Court has long stated, moreover,

---

[4] In that regard, it is important to note at least three limits on a claimant's ability to prevail under RFRA.

First, RFRA does not provide protection to philosophical, policy, political, or personal beliefs, for example. It protects only religious beliefs. 42 U.S.C. § 2000bb-1(a) ("Government shall not substantially burden a person's *exercise of religion* even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.") (emphasis added).

that religious beliefs need not be "acceptable, logical, consistent, or comprehensible to others" in order to merit protection. *Thomas*, 450 U.S. at 714. As Justice Brennan, the primary architect of the body of religious freedom law now incorporated into RFRA, once put it: "[R]eligious freedom – the freedom to believe and to practice strange and, it may be, foreign creeds – has classically been one of the highest values

---

Second, RFRA does not cover *insincere* religious beliefs – that is, beliefs that are not truly held – such as when someone asserts a personal objection dressed up as a religious objection. Under RFRA, the courts must police sincerity. As the Supreme Court has explained, RFRA reflects Congress's confidence in "the ability of the federal courts to weed out insincere claims." *Hobby Lobby*, 134 S. Ct. at 2774, slip op. at 29. And the *Hobby Lobby* Court approvingly cited a number of cases where courts have inquired into the sincerity of religious claims. *Id.* at 2774 nn.28-29, slip op. at 29-30 nn.28-29 (citing *United States v. Quaintance*, 608 F.3d 717, 718-19 (10th Cir. 2010); *Abate v. Walton*, 77 F.3d 488, 1996 WL 5320, at *5 (9th Cir. Jan. 5, 1996); *Ochs v. Thalacker*, 90 F.3d 293, 296 (8th Cir. 1996); *Green v. White*, 525 F. Supp. 81, 83-84 (E.D. Mo. 1981); *Winters v. State*, 549 N.W.2d 819, 819-20 (Iowa 1996)). As the Supreme Court has previously stated: "[W]hile the truth of a belief is not open to question, there remains the significant question whether it is truly held. This is the threshold question of sincerity which must be resolved in every case." *United States v. Seeger*, 380 U.S. 163, 185 (1965) (internal quotation marks omitted). In short, in these religious freedom cases, the courts appropriately "inquir[e] into the sincerity" of a claimant's "professed religiosity." *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005) (applying the related Religious Land Use and Institutionalized Persons Act).

Third, as explained more fully below, RFRA's compelling interest standard allows the Government to compel or proscribe action in certain circumstances even though, by doing so, the Government may be substantially burdening someone's religion.

of our society." *Braunfeld v. Brown*, 366 U.S. 599, 612 (1961) (Brennan, J., concurring in part and dissenting in part).

That bedrock principle means that we may not question the wisdom or reasonableness (as opposed to the sincerity) of plaintiffs' religious beliefs – including about complicity in wrongdoing. In *Hobby Lobby*, the Supreme Court emphatically confirmed that point. There, as here, the Government argued that the employers' alleged complicity in providing contraception did not infringe on the employers' religious beliefs. In particular, the Government claimed that "the connection between what the objecting parties must do" (pay for insurance) and "the end that they find to be morally wrong (destruction of an embryo)" was "simply too attenuated" because the end would occur only as a result of intervening decisions by individual covered employees. *Hobby Lobby*, 134 S. Ct. at 2777, slip op. at 35.

The Supreme Court adamantly rejected the basic premise of the Government's argument. The Court emphasized that federal courts have "no business" trying to answer whether the religious beliefs asserted in a RFRA case – including the complicity belief at issue in *Hobby Lobby* – are correct or reasonable. *Id.* at 2778, slip op. at 36. A federal court may not tell the objectors that "their beliefs are flawed," and thus may not arrogate to itself "the authority to provide a binding national answer to this religious and philosophical question" of complicity. *Id.* at 2778, slip op. at 36-37. Instead, the "narrow function" of federal courts is to determine whether the belief is sincere and "reflects an honest conviction." *Id.* at 2779, slip op. at 37-38 (internal quotation marks omitted). In doing so, moreover, courts must keep in mind that RFRA protects "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A) (defining "religious exercise" for purposes

of the related Religious Land Use and Institutionalized Persons Act); *see id.* § 2000bb-2 (incorporating that Act's definition set forth in § 2000cc-5 into RFRA).

As a matter of religious belief, plaintiffs in this case say that the act of submitting the required form makes them complicit in moral wrongdoing. Importantly, no one here disputes that plaintiffs' religious belief is sincere and reflects an honest conviction. *Cf. Wheaton College v. Burwell*, 134 S. Ct. 2806, 2808, slip op. at 4 (2014) (Sotomayor, J., dissenting) ("The sincerity of Wheaton's deeply held religious beliefs is beyond refute."); *id.* at 2812, slip op. at 11. Therefore, plaintiffs' decision to decline to submit the required letter or form is an "exercise of religion" under RFRA. No one disputes, moreover, that plaintiffs will be required to pay huge monetary penalties if they do not submit the required form. Those large monetary penalties plainly represent a "substantial burden" on plaintiffs' exercise of religion. *See Hobby Lobby*, 134 S. Ct. at 2759, slip op. at 2.

Judge Flaum persuasively summarized the point in a similar case that involved Notre Dame: "Yet we are judges, not moral philosophers or theologians; this is not a question of legal causation but of religious faith. Notre Dame tells us that Catholic doctrine prohibits the action that the government requires it to take. So long as that belief is sincerely held, I believe we should defer to Notre Dame's understanding." *University of Notre Dame v. Sebelius*, 743 F.3d 547, 566 (7th Cir. 2014) (Flaum, J., dissenting), *vacated and remanded*, 135 S. Ct. 1528 (2015). Judge Pryor has likewise cogently explained: "So long as the [religious organization's] belief is sincerely held and undisputed – as it is here – we have no choice but to decide that compelling the participation of the [religious organization] is a substantial burden on its religious exercise." *Eternal Word Television Network, Inc. v.*

*Secretary, Department of Health & Human Services*, 756 F.3d 1339, 1348 (11th Cir. 2014) (Pryor, J., specially concurring).

In short, under *Hobby Lobby*, the regulations substantially burden plaintiffs' exercise of religion.

The panel opinion concludes, however, that there is no substantial burden on plaintiffs' exercise of religion. In particular, the panel opinion says that plaintiffs are wrong to think that they would be complicit in moral wrongdoing if they submit this form, as required by the Government. But to reiterate: Judicially second-guessing the correctness or reasonableness (as opposed to the sincerity) of plaintiffs' religious beliefs is exactly what the Supreme Court in *Hobby Lobby* told us not to do. *See Hobby Lobby*, 134 S. Ct. at 2778, slip op. at 36. And *Hobby Lobby* was not the first Supreme Court case to say as much. *See Thomas*, 450 U.S. at 714-16.

The panel opinion responds that plaintiffs are simply misunderstanding the law and that the law, properly understood, does not actually make plaintiffs complicit in providing contraceptive coverage. But there is no dispute that the Government is requiring plaintiffs to submit a form (to the Government or to the insurer) or else pay a penalty. And there is no dispute that the form is part of the process by which the Government ensures that the religious organizations' insurers provide contraceptive coverage to the organizations' employees. In other words, the form matters and plays a role in this scheme. After all, if the form were meaningless, why would the Government require it? The Government is requiring plaintiffs to submit the form precisely because the form is part of the process by which the Government ensures that the religious organizations' insurers provide contraceptive coverage to the organizations'

employees.[5]  Plaintiffs in turn sincerely believe that submitting the form under those circumstances makes them complicit in wrongdoing in contravention of their religious beliefs.  *See* Plaintiffs' Supplemental Br. 1.  Compelling submission of the form therefore imposes a substantial burden under RFRA.[6]

The panel opinion separately notes that the Government intended the form to accommodate religious organizations so that the organizations themselves would not have to provide

---

[5] If the form were meaningless, the Government presumably would not require it and perpetuate this rancorous dispute with religious organizations around the country.

[6] The panel's concurrence in the denial of rehearing en banc largely echoes Justice Sotomayor's dissent in *Wheaton College*.  *Compare* Panel Concurrence at 5 ("In no respect do we, nor could we, question Plaintiffs' sincere beliefs about what their faith permits and forbids of them.  But we can and must decide which party is right about how the law works."), *with Wheaton College*, 134 S. Ct. at 2812, slip op. at 10 (Sotomayor, J., dissenting) ("Wheaton is mistaken – not as a matter of religious faith, in which it is undoubtedly sincere, but as a matter of law . . . .  Any provision of contraceptive coverage by Wheaton's third-party administrator would not result from any action by Wheaton; rather, in every meaningful sense, it would result from the relevant law and regulations.").  But the Supreme Court, by a 6-3 margin, did not agree with Justice Sotomayor's dissent in *Wheaton College*, at least for purposes of the injunction.  The Court instead granted an injunction under the All Writs Act to Wheaton College, which the Court could do only if it concluded that the required form "indisputably" would impose a substantial burden on Wheaton College's exercise of religion.  *See Turner Broadcasting System, Inc. v. Federal Communications Commission*, 507 U.S. 1301, 1303 (1993) (Rehnquist, C.J., in chambers) (internal quotation marks omitted); *Wheaton College*, 134 S. Ct. at 2808, slip op. at 4 (Sotomayor, J., dissenting) (internal quotation marks omitted).

contraceptive coverage. But the panel opinion has been faked out by the Government's accommodation. The accommodation provides an alternative, but the alternative itself imposes a substantial burden on the religious organizations' exercise of religion. Again, this case arises in a "Do X or Y or pay a penalty" posture. All agree that X – providing contraceptive coverage – infringes plaintiffs' exercise of religion. But so does Y – submitting the form. What the panel opinion misses is that submitting this form is *itself* an act that contravenes the organizations' sincere religious beliefs. It is no different from the recent *Holt* case, in which the act that contravened the Muslim prisoner's sincere religious beliefs was shaving his beard. Submitting the form = shaving your beard. Or the *Yoder* case, in which the act that contravened the Amish parents' beliefs was sending their children to high school. Submitting the form = sending your children to high school. Or the *Lee* case, in which the act that contravened the Amish employer's religious beliefs was paying Social Security taxes. Submitting the form = paying the Social Security tax. Or the *Sherbert* case, in which the act that contravened the Seventh-day Adventist's belief was working on Saturday, the Sabbath day of the faith. Submitting the form = working on the Sabbath.

In all of those cases, the Supreme Court recognized that the act in question represented a sincere religious belief that the Government could not override except by employing the least restrictive means to further a compelling governmental interest. The same is true here. The panel opinion does not fully come to grips with that critical point, in my view.

The panel opinion therefore also does not appreciate that the substantial burden on plaintiffs' exercise of religion comes from the monetary penalty (which in this case happens to be

huge) that the organizations will have to pay if they adhere to their religious beliefs and do not submit the required form. In *Holt*, the substantial burden came from the discipline the prisoner would receive if he refused to shave his beard. In *Yoder*, it was the $5 monetary fine for the parents whose children did not attend high school. In *Lee*, it was the monetary penalty for failure to pay taxes. In *Sherbert*, it was the denial of unemployment benefits for not working on the Sabbath.

The essential principle is crystal clear: When the Government forces someone to take an action contrary to his or her sincere religious belief (here, submitting the form) or else suffer a financial penalty (which here is huge), the Government has substantially burdened the individual's exercise of religion. So it is in this case.

To be clear, that conclusion does *not* mean that plaintiffs prevail on their RFRA claim. Rather, it means only that they prevail on the *first prong* of the three-part RFRA inquiry and that we now must move on to the second and third prongs. The Government may still be able to compel plaintiffs to submit the required form if the Government prevails on those second and third prongs. *Cf. Lee*, 455 U.S. at 257, 261 (Government may force Amish employer to pay Social Security taxes notwithstanding substantial burden on Amish employer's religion).

## II

*Second*, does the Government have a compelling interest in facilitating women's access to contraception – in particular, in facilitating access to contraception for the employees of these religious organizations? *See* 42 U.S.C. § 2000bb-1(b) ("Government may substantially burden a person's exercise

of religion only if it demonstrates that *application of the burden to the person* . . . is in furtherance of a compelling governmental interest.") (emphasis added); *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430-31 (2006) (compelling interest test focuses on interest as applied to particular plaintiffs).

The plaintiff religious organizations strenuously argue that there is no such compelling governmental interest. As I see it, however, plaintiffs' argument cannot be squared with the views expressed by a majority of the Justices in *Hobby Lobby*.

To begin with, how do we determine whether the Government has a "compelling interest" in overriding a fundamental constitutional or statutory right such as RFRA's right to religious freedom? Good question. No code or history book lists the Government's compelling interests. Rather, courts have developed those interests over time, in common-law-like fashion.[7] What we do know, to put it in colloquial and somewhat question-begging terms, is that the asserted governmental interest must be so critically important that it justifies overriding certain fundamental individual rights in certain circumstances. To quote the Supreme Court,

---

[7] The compelling interest nomenclature took root somewhat ignominiously in free speech cases as a way to justify the Government's suppression of Communist speech. *See, e.g.*, *Konigsberg v. State Bar of California*, 366 U.S. 36, 49-52 (1961); *Barenblatt v. United States*, 360 U.S. 109, 126-27 (1959); *Sweezy v. New Hampshire*, 354 U.S. 234, 265-67 (1957) (Frankfurter, J., concurring in result). In any event, the compelling interest override is now an established part of various constitutional doctrines, including the First and Fourteenth Amendments. And Congress expressly incorporated it into the Religious Freedom Restoration Act.

the interest must be "of the highest order." *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972); *see Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2781, slip op. at 41 (2014). Examples of compelling interests from past Supreme Court cases include conducting the military draft, maintaining the tax system, running the Social Security program, and preventing discrimination against third parties. *See Gillette v. United States*, 401 U.S. 437, 461-63 (1971); *Hernandez v. Commissioner of Internal Revenue*, 490 U.S. 680, 699-700 (1989); *United States v. Lee*, 455 U.S. 252, 257-59 (1982); *Bob Jones University v. United States*, 461 U.S. 574, 603-04 (1983).[8]

In this case, we do not have to tackle the compelling interest question without guidance from above. Justice Kennedy strongly suggested in his *Hobby Lobby* concurring opinion – which appears to be controlling de facto if not also de jure on this particular issue – that the Government generally has a compelling interest in facilitating access to contraception for women employees. *Hobby Lobby*, 134 S. Ct. at 2785-86, slip op. at 2 (Kennedy, J., concurring); *see also id.* at 2779-80, slip op. at 39-40 (majority opinion); *id.* at 2799-2801, slip op. at 23-27 (Ginsburg, J., dissenting); *cf. Marks v. United States*, 430 U.S. 188, 193 (1977). In particular, Justice Kennedy referred to the "premise" of the Court's decision: namely, its "assumption" that the

---

[8] As noted above, at least three aspects of RFRA limit the statute's reach and thus help answer the parade of horribles sometimes raised in opposition to religious freedom claims. First, RFRA covers only *religious* objections. Second, *insincere* religious claims are excluded from RFRA's protection. Third, RFRA's compelling interest standard allows the Government to compel or proscribe action in certain circumstances even though, by doing so, the Government may be substantially burdening someone's religion.

Government has a "legitimate and compelling interest" in facilitating access to contraception. *Hobby Lobby*, 134 S. Ct. at 2786, slip op. at 2 (Kennedy, J., concurring). Justice Kennedy's use of the term "compelling" in this context was no doubt carefully considered. And the four dissenting Justices likewise stated that the Government had a compelling interest in facilitating women's access to contraception. *Id.* at 2799-2801, slip op. at 23-27 (Ginsburg, J., dissenting).

It is not difficult to comprehend why a majority of the Justices in *Hobby Lobby* (Justice Kennedy plus the four dissenters) would suggest that the Government has a compelling interest in facilitating women's access to contraception. About 50% of all pregnancies in the United States are unintended. The large number of unintended pregnancies causes significant social and economic costs. To alleviate those costs, the Federal Government has long sought to reduce the number of unintended pregnancies, including through the Affordable Care Act by making contraceptives more cheaply and widely available. It is commonly accepted that reducing the number of unintended pregnancies would further women's health, advance women's personal and professional opportunities, reduce the number of abortions,[9] and help break a cycle of poverty that persists when women who cannot afford or obtain contraception become pregnant unintentionally at a young age. In light of the numerous benefits that would follow from reducing the number of unintended pregnancies, it comes as no surprise that Justice Kennedy's opinion expressly referred to a "compelling" governmental interest in facilitating women's access to contraception.

---

[9] As the panel opinion in this case accurately pointed out, as of now about 40% of all unintended pregnancies end in abortion.

In short, even if the Court did not formally hold as much, *Hobby Lobby* at least strongly suggests that the Government has a compelling interest in facilitating access to contraception for the employees of these religious organizations.[10]

III

*Third*, in light of those two conclusions, we must consider the least restrictive means issue. When, as here, a law substantially burdens the exercise of religion, but the law furthers a compelling governmental interest, RFRA requires the Government to use the "least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). The Supreme Court has emphasized that the "least-restrictive-means standard is exceptionally demanding." *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2780, slip op. at 40 (2014).

Congress adopted the least restrictive means requirement to help thread the needle between two conflicting principles. The least restrictive means requirement, properly applied, allows religious beliefs to be accommodated *and* the Government's compelling interests to be achieved – a win-win resolution of these often contentious disputes. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 436 (2006) (quoting 42 U.S.C. § 2000bb(a)(5)) (RFRA "'is a workable test for striking sensible balances between religious liberty and competing prior governmental interests.'"). As a leading First Amendment scholar has put

---

[10] Justice Kennedy's *Hobby Lobby* opinion did not expressly discuss whether a compelling governmental interest in ensuring general coverage for contraceptives encompasses ensuring coverage for those specific drugs and services that, some believe, operate as abortifacients and result in the destruction of embryos.

it: "If there's some way of granting an exemption and yet accomplishing the government's goal, then there's no real need to interfere with the religious practice, so the exemption must be granted." Eugene Volokh, *The First Amendment and Related Statutes* 986 (5th ed. 2014).

Requiring religious organizations to submit the form mandated by current federal regulations is not the Government's least restrictive means of furthering its interest in facilitating access to contraception for the organizations' employees. That is because the Government can still achieve its interest by allowing the religious organizations to submit the less restrictive notice that the Supreme Court has already *twice* indicated should be good enough to satisfy the Government's interest.

In the *Wheaton College* and *Little Sisters of the Poor* cases, the Supreme Court carefully specified that the religious organizations would satisfy their current legal obligations by submitting a simple notice to the Secretary of Health and Human Services "in writing that it is a nonprofit organization that holds itself out as religious and has religious objections to providing coverage for contraceptive services." *Wheaton College v. Burwell*, 134 S. Ct. 2806, 2807, slip op. at 1 (2014); *see also Little Sisters of the Poor Home for the Aged v. Sebelius*, 134 S. Ct. 1022, 1022, slip op. at 1 (2014) (notice should be "in writing that they are non-profit organizations that hold themselves out as religious and have religious objections to providing coverage for contraceptive services"); *cf. Eternal Word Television Network, Inc. v. Secretary, Department of Health & Human Services*, 756 F.3d 1339, 1349 (11th Cir. 2014) (Pryor, J., specially concurring) ("The United States, for example, could require the [religious organization] to provide a written notification of its religious objection to the Department of Health and Human Services.").

By contrast to the form required by current federal regulations, the *Wheaton College/Little Sisters of the Poor* notice does not require the religious organizations to identify or notify their insurers, and thus (according to plaintiffs) lessens the religious organizations' degree of complicity in what they consider to be wrongful as a matter of religious belief. *See* Plaintiffs' Supplemental Br. 10. And even with the less detailed *Wheaton College/Little Sisters of the Poor* notice, the Government can independently determine the identity of the organizations' insurers and thereby ensure that the insurers provide contraceptive coverage to the organizations' employees. The *Wheaton College/Little Sisters of the Poor* notice may create some administrative inconvenience for the Government, because the Government itself will have to identify the religious organizations' insurers. But administrative inconvenience alone does not negate the feasibility of an otherwise less restrictive means – unless the administrative problem would be "of such magnitude" that it would render "the entire statutory scheme unworkable." *Sherbert v. Verner*, 374 U.S. 398, 408-09 (1963); *see also Bowen v. Roy*, 476 U.S. 693, 731 (1986) (O'Connor, J., concurring in part and dissenting in part) ("[A]dministrative inconvenience is not alone sufficient to justify a burden on free exercise unless it creates problems of substantial magnitude.").

If a religious organization does not use the currently required form but instead uses the *Wheaton College/Little Sisters of the Poor* notice, how would that affect third parties, namely the religious organizations' employees? That question matters because the Supreme Court has stated that "courts must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries." *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005) (applying the related

Religious Land Use and Institutionalized Persons Act). In *Hobby Lobby*, the Court reiterated that this consideration "will often inform the analysis of the Government's compelling interest and the availability of a less restrictive means of advancing that interest." *Hobby Lobby*, 134 S. Ct. at 2781 n.37, slip op. at 42 n.37. As Justice Kennedy put it in his concurrence, the accommodation must not "unduly restrict other persons, such as employees, in protecting their own interests." *Id.* at 2787, slip op. at 4 (Kennedy, J., concurring).

But here, the religious organizations' employees would still receive the *same* insurance coverage from the *same* insurer for contraceptives. As the Supreme Court explained in its *Wheaton College* order: "Nothing in this interim order affects the ability of the applicant's employees and students to obtain, without cost, the full range of FDA approved contraceptives" or "precludes the Government from relying on this notice, to the extent it considers it necessary, to facilitate the provision of full contraceptive coverage under the Act." *Wheaton College*, 134 S. Ct. at 2807, slip op. at 1-2. So accommodating the religious organizations by allowing them to use the *Wheaton College/Little Sisters of the Poor* notice would not, to use Justice Kennedy's formulation, "unduly restrict" third parties. *Cf.* Douglas NeJaime & Reva B. Siegel, *Conscience Wars: Complicity-Based Conscience Claims in Religion and Politics*, 124 Yale L.J., at 116 (forthcoming 2015) (version of Apr. 10, 2015) ("*Wheaton College*, like *Hobby Lobby*, appears to tie accommodation to the fact that the government has other ways of providing for the statute's intended beneficiaries so that no third-party harm would result from the accommodation.").

Although the Supreme Court's *Wheaton College* and *Little Sisters of the Poor* orders were not final merits rulings, they at least qualify as extremely strong signals from the

Supreme Court about how to resolve the least restrictive means issue in this case. In particular, the Court in *Wheaton College* granted an injunction under the All Writs Act, which is appropriate "only where the legal rights at issue are indisputably clear." *Wheaton College*, 134 S. Ct. at 2808, slip op. at 4 (Sotomayor, J., dissenting) (internal quotation marks omitted). Moreover, the Court issued the *Wheaton College* order just days after its *Hobby Lobby* decision, and it did so over a detailed and forceful dissent.

In any event, regardless of whether we as a lower court are *formally* bound by the Supreme Court stay orders in *Wheaton College* and *Little Sisters of the Poor*, the notice identified by the Supreme Court in those two cases is undoubtedly a less restrictive way for the Government to further its interest than the form required by current federal regulations. It necessarily follows that the form required by current regulations is not the "least restrictive means" available to the Government. As the Supreme Court said a few months ago in a similar context: If "a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Holt v. Hobbs*, 135 S. Ct. 853, 864, slip op. at 11 (2015) (internal quotation marks omitted). So too here.

To be sure, some religious organizations claim that even the less restrictive *Wheaton College*/*Little Sisters of the Poor* notice still imposes a substantial burden on their religious beliefs. But that obviously does not help *the Government*'s argument in support of the current, even more burdensome form. The key point here is that the *Wheaton College*/*Little Sisters of the Poor* notice is less restrictive (that is, less burdensome) than the currently required form and yet still furthers the Government's compelling interest. Under RFRA,

the Government therefore must employ that less restrictive means.[11]

Put simply, the Government need not – and therefore under RFRA may not – pursue its compelling interest in facilitating access to contraception by requiring religious non-profit organizations to submit the form required by current federal regulations.[12]

---

[11] The *Wheaton College/Little Sisters of the Poor* notice requires a religious organization to, in effect, raise its hand to opt out. But contrary to what the panel's concurrence in the denial of rehearing en banc says, *see* Panel Concurrence at 3-4 n.1, the currently required form requires a religious organization both to raise its hand *and* to point to its insurer. From the perspective of the plaintiff religious organizations, the currently required form is therefore more burdensome because it makes the organizations identify or notify their insurers, which the organizations believe makes them more complicit in the provision of contraceptive coverage to which they object as a matter of religious belief.

[12] As the Court in *Hobby Lobby* noted, the Government could directly subsidize or provide contraceptives to employees of religious non-profit organizations. *See Hobby Lobby*, 134 S. Ct. at 2780-81, slip op. at 41. The direct funding option raises certain feasibility issues. A means that is not a reasonably feasible way of furthering the Government's interest cannot be deemed a less restrictive means of furthering that interest. In *Little Sisters of the Poor*, *Hobby Lobby*, and *Wheaton College*, the Court did not say that direct funding was the least restrictive means of furthering the Government's interest. If it had, then even the *Wheaton College/Little Sisters of the Poor* notice would itself be too restrictive. In any event, what matters in the present case is that the *Wheaton College/Little Sisters of the Poor* notice is less restrictive than the form required by the current federal regulations but still achieves the Government's interest.

One final note for clarity: The Government may of course continue to require the religious organizations' *insurers* to provide contraceptive coverage to the religious organizations' employees, even if the religious organizations object. As Judge Flaum correctly explained, "RFRA does not authorize religious organizations to dictate the independent actions of third-parties, even if the organization sincerely disagrees with them." *University of Notre Dame v. Sebelius*, 743 F.3d 547, 567 (7th Cir. 2014) (Flaum, J., dissenting), *vacated and remanded*, 135 S. Ct. 1528 (2015). "That is true whether the third-party is the government, an insurer, a student, or some other actor." *Id.* "So long as the government does not require" religious organizations themselves "to take action, RFRA does not give" the religious organizations "a right to prevent the government from providing contraceptives to" the religious organizations' employees. *Id.*

\* \* \*

In sum, I respectfully would grant rehearing en banc and rule for the plaintiff religious organizations on the ground that the *Wheaton College*/*Little Sisters of the Poor* notice is a less restrictive way than the currently mandated form for the Government to achieve its compelling interest in facilitating access to contraception for the organizations' employees.